**The PRESIDENT AND DIRECTORS OF GEORGETOWN COLLEGE**

v.

**Dennis W. MADDEN et al.**

Civ. No. K–77–1438.

United States District Court,
D. Maryland.

Sept. 24, 1980.

Vincent J. Fuller, Aubrey M. Daniel, III, Barry S. Simon and Williams & Connolly, Washington, D.C., and Edward S. Digges, Jr., Baltimore, Md., for plaintiff.

Paul M. Rhodes, Rhodes, Dunbar & Lomax, Chtd., Washington, D.C., and Annapolis, Md., and Tarrant H. Lomax, Annapolis, Md., for defendant Edward M. Crough, Trustee of Victor R. Beauchamp Associates, Inc.

J. Snowden Stanley, Jr., David M. Buffington and Semmes, Bowen & Semmes, Baltimore, Md., for defendants Dennis W. Madden and John M. Walton.

William B. Somerville and Howard G. Goldberg, Baltimore, Md., for defendant Seymour Auerbach.

Richard H. Nicolaides and Kelly & Nicolaides and Michael J. Looby, Washington, D.C., for defendant Reliance Ins. Co.

J. Frederick Motz and Ronald B. Sheff, Baltimore, Md., for defendants Edward J. Scullen and Alvin Marchigiani.

Richard H. Gins, Silver Spring, Md., for defendant Anchor Associates, Inc.

## FRANK A. KAUFMAN, District Judge.

The President and Directors of Georgetown College (Georgetown) bring this diversity action [1] sounding in breach of contract and negligence [2] against the architects, structural engineers, general contractor, masonry subcontractor, and surety involved in the construction of one of Georgetown's dormitories, Harbin Hall, which was built during the years 1963–66. Georgetown seeks damages for alleged defects in the construction of Harbin Hall, the surface brick of which has undergone spalling, cracking, and bulging.[3] This action was commenced on August 25, 1977.

Motions for summary judgment have been filed by all defendants. The majority of those motions are based on the grounds that this action is barred by limitations. For the purpose of adjudicating those motions, the facts have, for the most part, been stipulated.

In December 1962, Georgetown entered into a contract with two associated architec-

---

1. Georgetown is a nonprofit, educational corporation organized under the laws of the United States with its principal place of business in the District of Columbia. Defendants Madden, Walton and Auerbach (architects) are citizens of Maryland. Defendant Victor R. Beauchamp Associates, Inc. (Beauchamp) was the general contractor and is a Maryland corporation whose corporate existence was annulled in 1973 and therefore presently maintains no principal place of business. Service upon Beauchamp was made upon Edward M. Crough, a citizen of Maryland, in his capacity as one of Beauchamp's director-trustees. The remaining two director-trustees, Mr. and Mrs. Victor R. Beauchamp, citizens of Florida, are not parties to this action. Defendant surety, Reliance Insurance Co. (Reliance) is a Pennsylvania corporation with its principal place of business in Illinois. Defendant Anchor Associates (Anchor) was the subcontractor for masonry work and is a Delaware corporation with its principal place of business in Maryland. Defendants Scullen and Marchigiani, structural engineers, are citizens of Maryland. They were added as parties defendant by a December 15, 1978 Order of this Court. The amount in controversy exceeds $10,000.

2. The complaint is stated in five counts. Count I alleges breach of the construction contract by defendant Beauchamp. Count II charges negligence in the construction process by defendants Beauchamp and Anchor. Count III is a contract claim against Reliance and Beauchamp based upon the construction contract and the surety-payment bond provided by Standard Accident Insurance Co. (Reliance is the successor in interest to Standard). Count IV alleges negligent planning and/or supervision on the part of the architects. Count V is captioned Res Ipsa Loquitur. By Memorandum and Order dated January 12, 1978, Judge Young, to whom this case was originally as-

signed, interpreted Count V to allege negligence against all defendants and dismissed said count as to defendant Reliance because "[t]he involvement of Reliance is strictly contractual." (At 10.)

3. Defendant architects have each filed cross-claims against defendants Beauchamp, Anchor, Reliance and Scullen and Marchigiani. Defendant Reliance has filed cross-claims against defendants Anchor and Beauchamp. Defendants Scullen and Marchigiani have filed cross-claims against Beauchamp, Anchor, architects, and Reliance. Judge Young granted summary judgment for Reliance as to the cross-claims filed against it by the architects. Memorandum and Order of Judge Young, May 10, 1978. This Court granted summary judgment for Reliance on the cross-claims filed by Scullen and Marchigiani for the same reasons set forth by Judge Young. Memorandum and Order dated December 15, 1978.

A motion of defendant Crough, director-trustee of Beauchamp, to quash service of process was denied by Judge Young in a Memorandum and Order dated January 27, 1978. A copy of that Memorandum and Order is attached hereto. See Part VII, infra. Judge Young held (at 5) "[t]hat Edward Crough, as a director at forfeiture [of the corporate charter of Beauchamp], can be sued in the corporate name and is obligated to satisfy claims which plaintiff proves existed at the time of forfeiture, out of corporate assets which remain."

Motions to dismiss filed by defendant architects and by defendant Anchor have previously been denied by Judge Young in Memoranda and Orders dated January 12, 1978 and May 15, 1978, respectively. Motions to transfer this case to the District of Columbia were also denied by Judge Young in his January 12, 1978 Memorandum and Order.

tural firms, Cooper and Auerbach, and Walton and Madden (architects) [4] for the performance of architectural services relating to a proposed residential dormitory to be located on Georgetown's campus in Washington, D.C. Among the services to be performed were the inspection of the progress and quality of work during the construction phase of the project and the certification of progress payments to the contractor. In February 1963, the architects executed a letter agreement with the structural engineering firm of Scullen and Marchigiani. On October 24, 1963, Georgetown entered a construction contract with Victor R. Beauchamp Associates, Inc. (Beauchamp) for the construction of Harbin Hall in accordance with the plans and specifications incorporated therein. On the same date, Standard Accident Insurance Company, as surety, and Beauchamp, as principal, executed a performance-payment bond for the benefit of Georgetown in the penal sum of $2,019,-619.00. Defendant Reliance Insurance Co. (Reliance) is the successor in interest to Standard Accident Insurance Co. under that bond.

Under the terms of the construction contract (¶ 34), Beauchamp was permitted, with the approval of Georgetown, to subcontract specialty work according to normal contracting practices, with Beauchamp to remain fully liable for all acts or omissions of any subcontractor. Beauchamp subcontracted the masonry work to Anchor Associates, Inc. (Anchor). All the construction defects now complained of by Georgetown stem from the masonry work performed by Anchor.[5] Anchor completed the allegedly defective masonry work on or before July 24, 1964. As part of progress payment number twelve, dated November 13, 1964, defendant Madden certified the masonry work here in issue.[6]

4. Clark T. Cooper, associate in the firm of Cooper and Auerbach, is not a party to this action. A motion to dismiss for failure to join an indispensable party, filed by defendant architects, was denied by Judge Young in his Memorandum and Order of January 12, 1978.

5. Paragraph 17 of the amended complaint alleges as follows:

17. Defendant Beauchamp violated its contractual obligations to plaintiff when it completed construction work on Harbin Hall, at a date subsequent to January 1, 1966, that contained, *inter alia*, the following specific violations of the plans and specifications prepared by the defendant architects and incorporated by reference in the contract referred to in paragraph 11 above:

a. Half bricks (soaps) were used at each shelf angle, although full bricks were detailed.

b. There was a lack of parging on the brick face of the exterior brick, although parging was called for by the project documents.

c. The cavity between the brick and concrete block inner wall was intermittently filled with mortar, although a free draining cavity was detailed.

d. Ties between the brick and block or concrete were not placed at the required spacing and were of insufficient length.

e. The insulation used in the wall cavity was not water repellant, as called for by the project documents. Moreover, the intermittent filling of the cavity with mortar resulted in a lack of insulation in much of the wall cavity. The waterproofing system in the masonry walls was further incomplete in that specified weepholes had not been cleaned out as required.

f. Because of over-sanding and low cement content, the mortar used to install the masonry did not comply with the plans and specifications, thereby contributing to water infiltration of the wall cavity.

g. Bricks were not properly placed as specified on the shelf angle.

6. That certificate provided as follows:

Periodic Estimate for Partial Payment # 12 (October 1–31, 1964) CH–DC–16(D) Men's Residence Hall, Georgetown University, Washington, D. C.

CERTIFICATION OF ARCHITECT

I certify that I have checked and verified the above and foregoing Periodic Estimate for Partial Payment that to the best of my knowledge and belief it is a true and correct statement of the work performed and/or material supplied by the contractor; that all work and/or material included in this Periodic Estimate has been inspected by me and/or by my duly authorized representatives or assistants and that it has been performed and/or supplied in full accordance with the requirements of the referenced contract; and that partial payment claimed and requested by the Contractor is correctly computed on the basis of the work performed and/or material supplied to date.

WALTON AND MADDEN, Architects

Date: Nov. 13, 1964 By Dennis W. Madden
Acting as the authorized representative of Georgetown University

On September 23, 1964, four floors of Harbin Hall were first occupied and used by Georgetown. Certificates of occupancy were issued to Georgetown by the Department of Licenses and Inspections of the District of Columbia on November 17, 1964. Georgetown occupied the remainder of Harbin Hall on or before January 14, 1965, though work still remained to be done at that time. Final certification of the building by the architects and payment of the final installment to Beauchamp took place on June 2, 1966. Georgetown first discovered the defective condition which gave rise to the within suit in September 1976.

The construction contract between Georgetown and Beauchamp provides in relevant part:

¶ 25. Payments to Contractor

(a) Not later than the 15th day of each calendar month the Owner shall make a progress payment to the Contractor on the basis of a duly certified and approved estimate of the work performed during the preceding calendar month under this contract, but to insure the proper performance of this contract, the Owner shall retain ten per cent (10%) of the amount of each estimate until final completion and acceptance of all work covered by this contract * * *.

* * * * * *

(c) All material and work covered by partial payments made shall thereupon become the sole property of the Owner, but this provision shall not be construed as relieving the Contractor from the sole responsibility for the care and protection of materials and work upon which payments have been made or the restoration of any damaged work, or as a waiver of the right of the Owner to require the fulfillment of all of the terms of the contract.

* * * * * *

¶ 26. Acceptance of Final Payment Constitutes Release

The acceptance of the Contractor of final payment shall be and shall operate as a release to the Owner of all claims and all liability to the Contractor for all things done or furnished in connection with this work and for every act and neglect of the Owner and others relating to or arising out of this work. No payment, however, final or otherwise, shall operate to release the Contractor or his sureties from any obligations under this contract or the Performance and Payment Bond.

* * * * * *

¶ 40. General Guaranty

Neither the final certificate of payment nor any provision in the Contract Documents nor partial or entire occupancy of the premises by the Owner shall constitute an acceptance of work not done in accordance with the Contract Documents or relieve the Contractor of liability in respect to any express warranties or responsibility for faulty materials or workmanship. The Contractor shall remedy any defects in the work and pay for any damage to other work resulting therefrom, which shall appear within a period of one year from the date of final acceptance of the work unless a longer period is specified. The Owner will give notice of observed defects with reasonable promptness.

In addition to the above sections, the contract specified a single sum of $2,019,-619.00 to be paid by Georgetown to Beauchamp to "commence and complete" the construction of Harbin Hall. Other provisions in the contract made time of the essence for the full completion of the project and provided for completion of all required work within a specified time.[7]

7. *See, e. g.,* ¶ 5 (completion of the "work within the specified time"); ¶ 11 (contractor must "complete the entire work" in a workmanlike manner "within the time herein specified"); ¶ 19 (setting forth that "the time for completion as specified in the contract" is an essential condition and requiring the contractor to proceed so as to "insure full completion thereof, within the time specified"); ¶ 28 ("the Contractor and his surety shall be obligated to full performance of the Contractor's undertaking").

In fact, all work was not completed by the specified date. However, plaintiff seemingly did not pursue its remedies under paragraph 19 for liquidated damages.

### I. *Motion of Reliance Insurance Co. for Summary Judgment*

 Reliance seeks summary judgment on the grounds that plaintiff's claim under the performance bond is time-barred. In both Maryland and the District of Columbia, a bond is a specialty to which a twelve year statute of limitations attaches.[8] Md. Code Ann., Cts. & Jud.Proc. Art. § 5–

102(a)(2), D.C. Code § 12–301(6). Both Maryland and the District of Columbia have held that, in contract actions, the cause of action accrues and the limitations period runs from the date of the alleged breach and not from the date the harm is discovered.[9]

The exterior brick wall, which is the subject of this suit, was completed in June 1964 and certified by the architects as part of the

**8.** Both Beauchamp and Reliance have presented arguments for various limitations periods other than the twelve-year period for a specialty. Paragraph 40 of the construction contract, quoted *supra* at p. 6, provides for a one-year guarantee period after the completion of construction during which the contractor Beauchamp was required to repair any discovered defects. Reliance contends that parties to a contract are generally able to modify the statutory limitations period, that the performance bond expressly incorporates the construction contract, and that therefore the parties agreed to a one-year limitations period. Paragraph 40, however, does not embody a limitations period. Instead, that contract provision sets forth an additional promise by the contractor that should defective work be discovered within one year, the contractor would repair the same. Refusal to repair such defective work would have resulted in a separate breach of contract aside from the breach resulting from the defective work. Paragraph 40 is, therefore, an additional remedy for the owner—a right to have the defective work repaired—and not a limitations period. *See Fowler v. A & A Co.*, 262 A.2d 344, 347–48 (D.C.1970); *see also Zellan v. Cole*, 183 F.2d 139 (D.C.Cir.1950).

Georgetown, on the other hand, has argued that since one of its claims against the contractor sounds in negligence, this Court should apply negligence limitations principles. In particular, Georgetown has urged this Court to apply either the discovery rule, by which the limitations period would run from the date of discovery of the defect, *see Harig v. Johns-Manville Products Corp.*, 284 Md. 70, 394 A.2d 299 (1978), or Md.Code Ann. Cts. & Jud.Proc. § 5–108, which provides a twenty-year limitations period for certain injuries resulting from improvements to real property. However, "[t]he involvement of Reliance is strictly contractual." Memorandum and Order of Judge Young dated January 12, 1978, at 10. The surety's contractual burdens are limited to those which the surety itself has undertaken. *Commercial National Bank v. London & Lan-*

*caster Indemnity Co.*, 10 F.2d 641, 642 (D.C.Cir. 1925). While Reliance may well be liable for the negligence of the contractor, such liability is governed by the terms of the performance bond. As the performance bond is a specialty, any liability thereunder is subject to a twelve-year limitations period. *See Board of Education ex rel. IBM Corp. v. Lange*, 182 Md. 132, 137, 32 A.2d 695 (1943). As to § 5–108 of the Md. Courts Article, it is not applicable in a contract action. *See* Part II *infra*.

**9.** *Mayor and Council of Federalsburg v. Allied Contractors, Inc.*, 275 Md. 151, 157, 338 A.2d 275, *cert. denied*, 423 U.S. 1017, 96 S.Ct. 452, 46 L.Ed.2d 389 (1975); *Mumford v. Staton, Whaley & Price*, 254 Md. 697, 714–15, 255 A.2d 359 (1969); *Foley Corp. v. Dove*, 101 A.2d 841, 842 (D.C.1954). The recent extension of the discovery rule, *see Harig v. Johns-Manville Products Corp.*, 284 Md. 70, 394 A.2d 299 (1978), does not appear to affect this result. That extension is in the context of tort claims and not contract claims. In addition, the discovery rule applies to the "reasonably prudent plaintiff" (at 77, 394 A.2d 299) who "exercise[s] * * * reasonable care and diligence" (at 83, 394 A.2d 299). Given the inspections by plaintiff's architects as agents of plaintiff (1964 to authorize progress payment; 1966 for final certification) and the nature of the alleged defects (*e. g.*, use of half bricks, absence of surface parging, mortar in cavities) most of which could arguably have been apparent to a trained eye, it may be that plaintiff should have discovered those defects either in 1964 or in 1966. If the discovery rule were applicable to any of the limitations issues determined herein, summary judgment seemingly would not be appropriate because factual issues would be presented. However, this Court's view of the limitations issue, stated in detail *infra*, renders it unnecessary further to consider the discovery rule.

twelfth progress payment in November 1964. Though Georgetown fully occupied the building in January 1965, final payment was not certified by the architects until June 1966. If plaintiff's cause of action arose after August 26, 1965, the suit against Reliance was timely. Thus, it must be determined whether the breach occurred upon completion of the exterior wall in 1964 or upon final payment for the completed building in 1966. For reasons set forth *infra*, this Court concludes that the breach occurred upon final delivery and acceptance of the building in June 1966, and that thus this case against Reliance was timely commenced.

■ Because the construction contract is incorporated into the performance bond agreement, the two must be interpreted together. *Lange v. Board of Education*, 183 Md. 255, 261, 37 A.2d 317 (1944).[10] The contract of Georgetown with Beauchamp for the construction of Harbin Hall is a contract for a single sum. The contract is indivisible. In *Westinghouse Electric Corp. v. State Tax Commission*, 206 Md. 392, 402, 111 A.2d 661 (1955), Judge Collins wrote:

> The law seems to be, however, that where a total price for work is fixed by a contract, the work is not rendered divisible by the progress payments, particularly where the contract provided that the to-

tal price is not to be paid until the work is completed. [Citations omitted.]

Restatement [First] Contracts § 266, comment (e) relates to "divisible contracts." Illustration 4 to that Comment states (at 386):

> A engages B, a contractor, to build a house. A promises to pay instalments amounting to three-quarters of the agreed price as the building reaches specified stages of construction; and to pay the remaining quarter on receiving an architect's certificate of satisfactory completion. The contract is not divisible. The payments are not in exchange for a specified fraction of the building, but are part payments on account of a total sum. The only promises for an agreed exchange are the promises to build the completed house and to pay the total price.[11]

■ By the terms of the contract, Beauchamp was to deliver a completed building. Paragraph 25, quoted *supra* p. 563, providing for progress payments, reserves all of plaintiff's rights to require fulfillment of the contract; additionally, the contract is replete with references to the completion of the entire project.[12] The contract calls for a single, indivisible performance. That is true even though the construction of the building required performance over an extended period of time and even though there is provision for progress payments

---

**10.** *See* Memorandum and Order of Judge Young dated May 15, 1978, at 3.

**11.** Restatement [Second], Contracts, Tentative Draft No. 8, § 265 sets forth the concept of agreed equivalents:

> Where the performances to be exchanged under an exchange of promises can be apportioned into corresponding pairs of part performances so that the parts of each pair are properly regarded as agreed equivalents, a party's performance of his part of such a pair has the same effect on the other's duties to render performance of the agreed equivalent as it would have if only that pair of performances had been promised.

Illustration 7 discusses a construction contract in which the owner agrees to make progress payments:

> A contracts to build a house for B for $50,000, progress payments to be made monthly in an amount equal to 85% of the price of the work performed during the preceding month, the balance to be paid on the architect's certificate of satisfactory completion of the house. A unjustifiably stops work at the end of a month before the work is substantially completed and sues for the progress payment for that month. The performance during that month and the corresponding progress payment are not agreed equivalents. A can recover nothing under the contract for that performance. B has a claim against A for damages for breach. Whether A has a claim against B in restitution is determined under the rules stated in prospective Chapter 16.

*See also* comment e to § 265.

**12.** *See* n.7 *supra*.

during the course of the construction and prior to completion of the entire project.[12A]

▋ Under the terms of the construction contract, Georgetown had the right to require defects to be remedied by the contractor, Beauchamp, at any time prior to final acceptance. Paragraph 20 of the Construction Contract provided:

20. Correction of Work

All work, all materials, whether incorporated in the work or not, all processes of manufacture, and all methods of construction shall be at all times and places subject to the inspection of the Architect/Engineer who shall be the final judge of the quality and suitability of the work, materials, processes of manufacture, and methods of construction for the purposes for which they are used. Should they fail to meet his approval they shall be forthwith reconstructed, made good, replaced and/or corrected, as the case may be, by the Contractor at his own expense. Rejected material shall immediately be removed from the site. If, in the opinion of the Architect/Engineer, it is undesirable to replace any defective or damaged materials or to reconstruct or correct any portion of the work injured or not performed in accordance with the Contract Document, the compensation to be paid to the Contractor hereunder shall be reduced by such amount as in the judgment of the Architect/Engineer shall be equitable.

Paragraph 23 further provided:

23. Right of the Owner to Terminate Contract

In the event that any of the provisions of this contract are violated by the Contractor, or by any of his subcontractors, the Owner may serve written notice upon the Contractor and the Surety of its intention to terminate the contract, such notices to contain the reasons for such intention to terminate the contract, and unless within ten (10) days after the serving of such notice upon the Contractor, such violation or delay shall cease and satisfactory arrangement of correction be made, the contract shall, upon the expiration of said ten (10) days, cease and terminate. In the event of any such termination, the Owner shall immediately serve notice thereof upon the Surety and the Contractor and the Surety shall have the right to take over and perform the contract; Provided, however, that if the Surety does not commence performance thereof within ten (10) days from the date of the mailing to such Surety of notice of termination, the Owner may take over the work and prosecute the same to completion by contract or by force for the account and at the expense of the Contractor and the Contractor and his Surety shall be liable to the Owner for any excess cost occasioned the Owner thereby, and in such event the Owner may take possession of and utilize in completing the work, such materials, appliances, and plant as may be on the site of the work and necessary therefor.

Accordingly, under those provisions of the construction contract, no breach of the sort alleged herein could occur until and unless the Contractor refused to remedy the discovered defect. Such request to remedy could be made at any time during the course of the contract. If the Contractor corrected the alleged defects, there would be no breach of the contract and, accordingly, no cause of action under the performance bond. In fact, the surety's bond agreement provided that the bond would be void

if the Principal [Beauchamp] shall well, truly and faithfully perform its duties, all the undertakings, covenants, terms, conditions, and agreements of said contract during the original term thereof, and any extensions thereof which may be granted by the Owner, with or without notice to the Surety, and if he [Beauchamp] shall

---

**12A.** *See* pp. 9–10 & n.11 *supra; cf. Mayor and Council of Federalsburg v. Allied Contractors,* 275 Md. 151, 157, 338 A.2d 275, *cert. denied,* 423 U.S. 1017, 96 S.Ct. 452, 46 L.Ed.2d 389 (1975); Restatement [Second] Contracts, Tentative Draft No. 8, § 259 & comment e; Restatement [First], Contracts § 270.

satisfy all claims and demands incurred under such contract * * *.

 The breach of the construction contract therefore occurred only upon final acceptance of the building under the contract.[13] A cause of action for breach of the construction contract accrued when Beauchamp delivered a building not in accordance with the contract specifications.[14] By the terms of the contract, ¶ 40, the final certification and acceptance of the building did not constitute acceptance of "work not done in accordance with the Contract Documents."[15]

For this Court to hold that the cause of action for breach of contract arose and the statute of limitations began to run as of the date of final delivery and acceptance of the entire building leads to a reasonable result. If this Court were to hold—as it does not— that the breach occurred and the cause of action accrued as of the date the defect was incorporated into the building or as of the date the architect certified that portion of the building containing the defect, each defect or certification would constitute its own breach and would start the statute of limitations running as to it alone. If the contract performance extends over a substantial period of time—as it did in this case, in which nearly three years elapsed between the signing of the contract and final acceptance of the completed building—then the limitations period for early defects would expire long before those for later defects. A court would be required closely to scrutinize each step in the construction process to determine when the breach occurred and a cause of action accrued. If an early defect contributed to a

---

13. *Cf. United States Fidelity & Guaranty Co. v. Hamilton and Spiegel, Inc.*, 241 Md. 133, 215 A.2d 735 (1966). None of the cases relied upon by Reliance in urging that the breach occurred at the time the exterior masonry was completed in 1964 alters this result. In *Mettee v. Boone*, 251 Md. 332, 247 A.2d 390 (1968), plaintiff brought suit on what was seemingly a single sum contract for the construction of a house, alleging that defendant contractor had used the wrong type of pipes. The contract was dated September 3, 1959. In deciding when the cause of action accrued, Judge McWilliams (at 335, 247 A.2d 390) apparently accepted the defendant builder's undisputed statement under oath that "the work * * * was completed before 1 March 1960" without determining whether "the work" was just the installation of pipes or the completion of the entire house. Suit was filed on May 17, 1967, and the Court held that plaintiff was barred by the three-year statute of limitations, applying the time of breach rule. In light of *Mayor and Council of Federalsburg v. Allied Contractors*, 275 Md. 151, 338 A.2d 275, *cert. denied*, 423 U.S. 1017, 96 S.Ct. 452, 46 L.Ed.2d 389 (1975), and the other authorities discussed and/or cited in this opinion, Reliance's contention that *Mettee* requires the conclusion that the breach here occurred in 1964 when the exterior masonry was completed may not prevail. Furthermore, it may well be that the *Mettee* suit was in fact filed more than three years after both installation of the pipes and completion of the house.

Reliance further cites *Foley Corp. v. Dove*, 101 A.2d 841 (D.C.1954), and *Poole v. Terminix Co.*, 84 A.2d 699 (D.C.1951), *aff'd*, 200 F.2d 746 (D.C.Ct.App.1952). Those cases merely stand for the general rule that the statute of limita- tions begins to run when a given contract is breached. Thus, a case-by-case determination is required to determine when, in each case, such a breach occurred. *See also Lieberman v. Aldon Construction Co.*, 125 A.2d 517 (D.C. 1956).

14. The certification by the architect of progress payment No. 12, including the exterior masonry, did not bind the owner or relieve the surety of liability if such certification was in error.

The rule seems to be settled that where a construction contract requires, as a condition of payments to the contractor, a certificate or estimate of an architect, engineer, or other person designated in the contract, showing the amounts due, the owner is not responsible, as against the surety on the contractor's bond, for the mistakes of the architect or engineer, and the surety is not discharged from liability to the owner by reason of payments made in good faith in accordance with overestimates or erroneous certificates, although such payments exceed, in fact, the sums due under the contract.

Annotation: Contractor's Bond-Payment Releasing Surety, 127 A.L.R. 10, 77 (1940).

15. Even in the absence of such a contract, the same result may pertain in modern times. *See Rosenberg v. Town of North Bergen*, 293 A.2d 662, 665–66 (N.J.1972); *see also* 118 Cong.Rec. 36941 (1972). For a discussion of what the New Jersey Court in *Rosenberg* described as the "earlier 'completed and accepted' rule," *see*, Annotation: Acceptance of Construction Work as Releasing Contractors or Sureties, 109 A.L.R. 625 (1937).

later defect and the statute had run as to the earlier but not as to the later breach, what could prove to be a very technical analysis might be required of the court to determine which breach was in issue and to what extent one breach might have contributed to the other. Moreover, if the construction of a building were to extend over a longer period than the statute of limitations, limitations might well run on an earlier defect before the complaining party would have an adequate opportunity to discover it.

On the other hand, when the final acceptance is considered as the date of breach, the court has a fixed point in time upon which to focus in determining whether the limitations period has run. That result is particularly desirable where, as here, the contract is for a single performance, *i. e.*, a completed building, and provides that the work may be inspected at any time during the course of the contract and that correction may be required for any defect as noted. *See* ¶ 23 of the contract.[16] Furthermore, to hold that the limitations period begins to

---

**16.** *See also* ¶ 19 of the contract which provides as follows:

**19. Time for Completion and Liquidated Damages**

It is hereby understood and mutually agreed, by and between the Contractor and the Owner, that the date of beginning and the time for completion as specified in the contract of the work to be done hereunder are ESSENTIAL CONDITIONS of this contract; and it is further mutually understood and agreed that the work embraced in this contract shall be commenced on a date to be specified in the "Notice to Proceed."

The Contractor agrees that said work shall be prosecuted regularly, diligently, and uninterruptedly at such rate of progress as will insure full completion thereof within the time specified. It is expressly understood and agreed, by and between the Contractor and the Owner, that the time for the completion of the work described herein is a reasonable time for the completion of the same, taking into consideration the average climatic range and usual industrial conditions prevailing in this locality.

If the said Contractor shall neglect, fail or refuse to complete the work within the time herein specified, or any proper extension thereof granted by the Owner, then the Contractor does hereby agree, as a part consideration for the awarding of this contract, to pay to the Owner the amount specified in the contract, not as a penalty but as liquidated damages for such breach of contract as hereinafter set forth, for each and every calendar day that the Contractor shall be in default after the time stipulated in the contract for completing the work.

The said amount is fixed and agreed upon by and between the Contractor and the Owner because of the impracticability and extreme difficulty of fixing and ascertaining the actual damages the Owner would in such event sustain, and said amount is agreed to be the amount of damages which the Owner would sustain and said amount shall be retained from time to time by the Owner from current periodical estimates.

It is further agreed that time is of the essence of each and every portion of this contract and of the specifications wherein a definite and certain length of time is fixed for the performance of any act whatsoever; and where under the contract an additional time is allowed for the completion of any work, the new time limit fixed by such extension shall be of the essence of this contract. *Provided*, That the Contractor shall not be charged with liquidated damages or any excess cost when the delay in completion of the work is due:

(a) To any preference, priority or allocation order duly issued by the Government;

(b) To unforeseeable cause beyond the control and without the fault or negligence of the Contractor, including, but not restricted to, acts of God, or of the public enemy, acts of the Owner, acts of another Contractor in the performance of a contract with the Owner, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather; and

(c) To any delays of Subcontractors or suppliers occasioned by any of the causes specified in subsections (a) and (b) of this article: *Provided, Further*, that the Contractor shall, within ten (10) days from the beginning of such delay, unless the Owner shall grant a further period of time prior to the date of final settlement of the contract, notify the Owner, in writing, of the causes of the delay, who shall ascertain the facts and extent of the delay and notify the Contractor within a reasonable time of its decision in the matter.

Various other times during the course of a construction project could conceivably, in other circumstances, be considered as the time when a breach results and the statute of limitations begins to run. For instance, the date of initial occupancy by the owner (*see* discussion of D.C. Code Section 12–310, *infra*), the date of complete occupancy by the owner, or the date certificates of occupancy are issued by the relevant housing administration could be deemed relevant factors where the construction contract is otherwise silent as to when the contract is substantially completed and breached for

run when the completed building is delivered wholly comports with the purpose of a limitations period to bar stale claims and to bring about repose. A statute of limitations is not designed to allow parties to avoid answering for their errors and wrongs. Nor is there any difficulty posed by potential delays by the architect or owner in certifying final completion and thereby extending the limitations period. In practice, contractors will be anxious to obtain final payment, including percentages withheld from progress payments, and hardly will countenance delays.[16A]

In sum, this Court concludes that the breach here in issue did not occur until June 2, 1966. As Georgetown had 12 years from that date to file its claim, and as that claim was filed on August 26, 1977, the claim against Reliance has been timely stated by Georgetown. Accordingly, Reliance's summary judgment motion will be denied.

> purposes of the statute of limitations. However, such other possible dates are not relevant where, as here, the contract expressly negates the consideration of such times. Paragraph 40, quoted in full in the text at p. 563, provides in part:
>> Neither final certificate of payment * * * nor partial or entire occupancy of the premises by the Owner [Georgetown] shall constitute an acceptance of work not done in accordance with the Contract Documents or relieve the Contractor of liability * * * for faulty materials or workmanship.
>
> Given the express wording of the contract here in issue, the time at which this contract was breached is the date of final acceptance of the building.

**16A.** Additionally, if the parties had so desired, they might have been able effectively to provide a shorter, but still reasonable, limitations period. *See* Restatement of Contracts § 558 comment a. They did not so do.

**17.** See n. 2 *supra*. Defendant Anchor has not filed a motion for summary judgment and, because it is now in receivership has, with the permission of this Court, not been actively participating in this litigation. However, since all decisions herein relating to Beauchamp on the tort claims are equally applicable to Anchor, all of the parties, including Anchor, agree that Anchor is in the same position as Beauchamp insofar as Part II of this opinion is concerned.

**18.** *Uppgren v. Executive Aviation Services, Inc.*, 326 F.Supp. 709, 711 (D.Md.1971); *Debbis*

## II. Motions of Defendants Madden, Walton, Auerbach, Scullen and Marchigiani, and Beauchamp re Tort Claims[17]

Because this is a diversity case, this Court must apply the conflicts of laws rules of Maryland, the forum state. *Klaxon v. Stentor Electrical Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In tort actions, Maryland applies the doctrine of lex loci delicti; the applicable substantive law is the law of the place of the wrong, i. e., the law of the state in which the injury occurs.[18] On the other hand, as to matters of procedural law, Maryland applies the law of the forum. *Doughty v. Prettyman*, 219 Md. 83, 88, 148 A.2d 438 (1959).[19] In this case there is no question that the alleged injury to Georgetown occurred in the District of Columbia, the site of the allegedly defective construction, and that the substantive law of that jurisdiction applies.

Both Maryland and the District of Columbia have enacted statutes,[20] to limit the

v. Hertz Corp., 269 F.Supp. 671, 674–75 (D.Md. 1967); *Leonard v. Wharton*, 268 F.Supp. 715, 719 (D.Md.1967), appeal dismissed, 396 F.2d 452 (4th Cir. 1968), cert. denied, 393 U.S. 1028, 89 S.Ct. 624, 21 L.Ed.2d 571 (1969); *White v. King*, 244 Md. 348, 354–55, 223 A.2d 763 (1966).

**19.** In addition, *see Leonard v. Wharton*, 268 F.Supp. at 719; *Billingsley v. Lincoln National Bank*, 271 Md. 683, 685 n.1, 320 A.2d 34 (1974).

**20.** Md.Code Ann., Cts. & Jud.Proc. Art. § 5–108 provides:
> **§ 5–108. Injury to person or property occurring 20 years after completion of improvement to realty not actionable; exception.**
> (a) *Injury resulting from improvement to realty.*—Except as provided by this section, no cause of action for damages accrues and a person may not seek contribution or indemnity for damages incurred when wrongful death, personal injury, or injury to real or personal property resulting from the defective and unsafe condition of an improvement to real property occurs more than 20 years after the date the entire improvement first becomes available for its intended use.
> (b) *Exception.*—This section does not apply if the defendant was in actual possession and control of the property as owner, tenant, or otherwise when the injury occurred.
> (c) *When action accrues.*—A cause of action for an injury described in this section accrues when the injury or damage occurs.

liability of architects, engineers, and builders to designated periods of time for injuries resulting from improvements to real property. The liability period provided by the Maryland statute (Md.Code Ann., Cts. & Jud.Proc. Art. § 5–108) is twenty years to contractors, architects and engineers.[21] The District of Columbia statute (D.C.Code § 12–310) establishes a liability period of ten years. Whether plaintiff's tort claims against the architects, contractors, and structural engineers are time-barred raises

three issues: (a) Is D.C.Code § 12–310 a substantive or procedural law of the District of Columbia? (b) If it is substantive, is it applicable in the within case? and (c) If it is applicable herein, is it constitutional? For the reasons set forth hereinbelow, this Court holds that D.C.Code § 12–310 is substantive law and would therefore be applied to this case by the Court of Appeals of Maryland, that § 12–310 is applicable in this case, and that § 12–310 is constitutional.

In 1979, § 5–108 was amended to read as follows:

§ 5–108. Injury to person or property occurring after completion of improvement to realty.

(a) *Injury occurring more than 20 years later.*—Except as provided by this section, no cause of action for damages accrues and a person may not seek contribution or indemnity for damages incurred when wrongful death, personal injury, or injury to real or personal property resulting from the defective and unsafe condition of an improvement to real property occurs more than 20 years after the date the entire improvement first becomes available for its intended use.

(b) *Action against architect or professional engineer.*—A cause of action for damages does not accrue and a person may not seek contribution or indemnity from any architect or professional engineer for damages incurred when wrongful death, personal injury, or injury to real or personal property, resulting from the defective and unsafe condition of an improvement to real property, occurs more than 10 years after the date the entire improvement first became available for its intended use.

(c) *Three-year limitation after accrual of cause of action.*—Upon accrual of a cause of action referred to in subsections (a) and (b), an action shall be filed within 3 years.

(d) *Exception.*—This section does not apply if the defendant was in actual possession and control of the property as owner, tenant, or otherwise when the injury occurred.

(e) *When action accrues.*—A cause of action for an injury described in this section accrues when the injury or damage occurs.

The applicable District of Columbia statute provides:

§ 12–310. Actions arising out of death or injury caused by defective or unsafe improvements to real property.

(a)(1) Except as provided in subsection (b), any action—

(A) to recover damages for—

(i) personal injury,

(ii) injury to real or personal property, or

(iii) wrongful death,

resulting from the defective or unsafe condition of an improvement to real property, and

(B) for contribution or indemnity which is brought as a result of such injury or death, shall be barred unless in the case where injury is the basis of such action, such injury occurs within the ten-year period beginning on the date the improvement was substantially completed, or in the case where death is the basis of such action, either such death or the injury resulting in such death occurs within such ten-year period.

(2) For purposes of this subsection, an improvement to real property shall be considered substantially completed when—

(A) it is first used, or

(B) it is first available for use after having been completed in accordance with the contract or agreement covering the improvement, including any agreed changes to the contract or agreement, whichever occurs first.

(b) The limitation of actions prescribed in subsection (a) shall not apply to—

(1) any action based on a contract, express or implied, or

(2) any action brought against the person who, at the time the defective or unsafe condition of the improvement to real property caused injury or death, was the owner of or in actual possession or control of such real property.

(Oct. 27, 1972, Pub.L. 92–579, § 1(a), 86 Stat. 1275.)

**21.** What is today § 5–108(b) was added effective July 1, 1979. It provides for a ten-year period to be applicable to architects and professional engineers. The twenty-year period remains in effect with regard to contractors. The question of whether, if Maryland law were applicable herein, a ten-year or a twenty-year period would apply to Georgetown's claims against the architects and engineers in this case need not be reached herein since this Court holds that District of Columbia law, not Maryland law, is applicable to those tort claims.

### A. *Substance or Procedure*

The characterization which a Maryland state court would give D.C. Code § 12–310—i. e., substantive or procedural—is binding upon this Court. *See Maryland Casualty Co. v. Williams*, 377 F.2d 389, 393 n.1 (5th Cir. 1967). As a general rule, a statute of limitation is considered procedural. *Doughty v. Prettyman*, 219 Md. at 88, 148 A.2d 438. However, when the statute of limitations bars the right and not merely the remedy, an exception to the general rule applies and the statute of limitations is considered substantive.[22]

Certain statutes of limitations have been held substantive rather than procedural in wrongful death (statutory) actions.[23] The reasoning in those wrongful death action cases would seem applicable with regard to the tort actions herein.

Although no District of Columbia or Maryland or any other court has seemingly construed D.C.Code § 12–310, the Court of Special Appeals of Maryland recently spoke as follows concerning Md.Code Ann., Cts. & Jud.Proc. Art. § 5–108:

> Although framed as a statute of limitations, § 5–108 has been classified in the Revisor's Note as a grant of immunity to builders, contractors, realtors, and landlords after 20 years from the date the improvement is completed.

*Allentown Plaza Associates v. Suburban Propane Gas Corp.*, 43 Md.App. 337, 338 n.2, 405 A.2d 326 (1979). Therein, Judge Moore further stated (at 343, 405 A.2d 326), after quoting from the Revisor's Note:

> In our judgment, there is substantial merit to the suggestion in the Revisor's Note, that the section be conceived "as a grant of immunity."

The Maryland Revisor's Note to section 5–108 provides, in relevant part, as follows (emphases added):

> This section is new language derived from Article 57, § 20. It is believed that this is an attempt to relieve builders, contractors, landlords, and realtors of the risk of latent defects in design, construction, or maintenance of an improvement to realty manifesting themselves more than 20 years after the improvement is put in use. *The section is drafted in the form of a statute of limitation, but, in reality, it grants immunity from suit in certain instances.* Literally construed, it would compel a plaintiff injured on the 364th day of the 19th year after completion to file his suit within one day after the injury occurred, a perverse result to say the least, which possibly violates equal protection. Alternatively, the section might allow wrongful death suits to be commenced 18 years after they would be barred by the regular statute of limitations.
>
> *The section if conceived of as a grant of immunity, avoids these anomalies.* The normal statute of limitations will apply if an actionable injury occurs.[24]

That Revisor's Note was before the Maryland legislature when it voted on the pro-

---

**22.** *Leonard v. Wharton*, 268 F.Supp. at 718–19; *see Slate v. Zitomer*, 275 Md. 534, 542, 341 A.2d 789, (1975), *cert. denied sub nom. Gasperich v. Church*, 423 U.S. 1076, 96 S.Ct. 862, 47 L.Ed.2d 87, (1976); *see also* Restatement [Second], Conflict of Laws § 143; Restatement [First] Conflict of Laws § 605.

**23.** *See* n.22 *supra. See also Blocher v. Harlow*, 268 Md. 571, 581, 303 A.2d 395 (1973). The status of certain positions stated in *Blocher* concerning whether the appellate review was or was not premature may be questioned by the opinion in *Eastgate Associates v. Apper*, 276 Md. 698, 350 A.2d 661 (1976). That latter issue is of no moment herein.

**24.** The Revisor's Note was included in the 1974 Courts and Judicial Proceedings volume of the Maryland Code Annotated and appeared therein immediately after § 5–108. It does not appear in the 1980 replacement volume as an appendix to § 5–108, as amended in 1979. The 1979 amendments to § 5–108 embody the substance of the Revisor's Note and clarify the terms of § 5–108 by providing, in § 5–108(c), that the three-year statute of limitations on filing an action begins to run when the cause of action accrues. The pre-1979 statute, like the statute as amended in 1979, provides that no cause of action will accrue more than twenty years after the date of the first use of the improvement.

posed legislation.[25] As such, the Note is a strong and clear indication of legislative intent. *See Allers v. Tittsworth*, 269 Md. 677, 683, 309 A.2d 476 (1973) (Henderson Commission's comment).

If Maryland would likely consider its own statute as a grant of immunity, it is also likely that Maryland would view D.C.Code § 12–310 in the same way. The legislative history of § 12–310 states (118 Cong.Rec. 36939 (1972)):

> The purpose of S. 1524 is to provide a limitation on the period of time during which an action may be brought to recover damages, contribution, or indemnity against architects, designers, engineers, or contractors on the ground of a defective or unsafe condition of an improvement to real property. At the present time in the District of Columbia there is no limitation as to the period of liability of an architect, engineer, or contractor for a defective or unsafe condition in an improvement to real property. Thus, such parties may become defendants in a suit brought by a person who sustains a personal injury in a building which was built 25 or even 50 years ago. The only limitation applying in such case under District of Columbia law is that such an action must be brought within 3 years after the date the cause of action accrues.
>
> The bill, S. 1524 reported by the Senate, would require that such an action would be barred unless it is brought within 10 years from the date the improvement to real property was substantially completed.

The above-quoted legislative history could be read to mean that the claim must be filed within ten years from the date of substantial completion of the structure involved. That, however, would raise the difficulties set forth in the Revisor's Note to Md.Code Ann., Cts. & Jud.Proc. Art. § 5–108 (1974 volume). Further, in 1967, when the proposed District of Columbia statute was first debated in Congress, Congressman Abernethy, speaking for the Committee on the District of Columbia, in calling up the bill, made clear that the proposed statute was intended to operate independently of the normal three-year statute of limitations and that it would therefore operate upon the right, and not upon the remedy (113 Cong.Rec. 28158 (1967)):[26]

> The effect of this amendment is that if a cause of action accrues at any time up to and including the last day of the 5-year period from the date the improvement was substantially completed [ten years in the later version of § 12–310], an action in damages for injury to real or personal property could be filed within 3 years—District of Columbia Code, section 12–301(3)—in the case of personal injury an action could be filed within 3 years— District of Columbia Code, section 12–301(8)—and in the case of wrongful

---

**25.** Section 5–108 of the Courts and Judicial Proceedings Article, as it appeared in the third reader file copy of SB 1 of the Maryland 1973 special session, includes the statute and a word-for-word version of the Revisor's Note as set forth in the 1974 codification of the Courts Article.

Georgetown has cited to a proposed but not enacted amendment to § 5–108, Senate Bill No. 18, filed January 12, 1977, which would have expressly enacted an "immunity" for architects and professional engineers after a designated limitations period. Georgetown contends that because the amendment failed, the legislature did not intend immunity as the Revisor's Note suggests. Aside from the fact that the Court of Appeals of Maryland has held that "a subsequent legislative construction of the meaning of a prior statute is not binding or controlling," *A. G. Crunkleton Electric Co. v. Barkdoll*, 227 Md.

364, 369, 177 A.2d 252 (1962), the Amendment contained four obvious changes to § 5–108. In addition to the express reference to immunity, the proposed bill singled out architects and engineers as the only persons entitled to immunity (a classification which some courts have invoked to declare similar statutes violative of equal protection principles), reduced the "limitations period" from twenty to ten years, and altered the definition of when an improvement is "substantially completed" and the limitations period starts running. It is speculative to cite any one change as the basis for failure of the proposed amendment to be enacted.

**26.** The 1967 legislative history was referred to during the passage of the 1972 Act; accordingly, the 1967 history would appear to be relevant in connection with the enactment of the 1972 legislation. *See* 118 Cong.Rec. 36941 (1972).

death, an action could be filed within 1 year—District of Columbia Code, section 16–2702.

Thus, D.C.Code § 12–310, like Md.Code Ann., § 5–108, provides immunity after the ten-year period (twenty in Maryland) has elapsed.

Though no court appears to have considered any similar statutes in a choice of law setting, such statutes have been construed by courts in various other contexts. All but one court has held such similar statutes to be substantive law.[27]

In *Rosenberg v. Town of North Bergen*, 293 A.2d 662, 666–67 (N.J.1972), the Supreme Court of New Jersey in considering a constitutional due process attack on a similar statute [28], wrote as follows:

> It seems important, first, to examine the nature of this law. In an important respect it is unlike the typical statute of limitations. Commonly such a statute fixes a time within which an injured person must institute an action seeking redress, and generally this time span is measured from the moment the cause of action accrues. Here such is not the case. The time within which suit may be brought under this statute is entirely unrelated to the accrual of any cause of action.
>
> Where a claim for redress is based upon negligent injury to person or property, the cause of action accrues when there has been a negligent act with proximately resulting injury or damage. The careless act itself is not enough to give rise to a cause of action; there must also be consequential injury or damage. [Citation omitted.] Thus plaintiff's alleged cause of action did not arise until she fell and sustained injury. Of course this was many years after the ten-year period fixed by the statute had expired. She claims that the statute, in its application to her, amounts to a deprivation of due process, since, as she expresses it, the statute bars her cause of action before it has arisen. This formulation suggests a misconception of the effect of the statute. It does not bar a cause of action; its effect, rather, is to prevent what might otherwise be a cause of action, from ever arising. Thus injury occurring more than ten years after the negligent act allegedly responsible for the harm, forms no basis for recovery. The injured party literally has *no* cause of action. The harm that has been done is *damnum absque injuria*—a wrong for which the law affords no redress. The function of the statute is thus rather to define substantive rights than to alter or modify a remedy. The Legislature is entirely at liberty to create new rights or abolish old ones as long as no vested right is disturbed. [Citations omitted.]

**27.** One commentator has written concerning similar statutes (Comment, Limitation of Action Statutes for Architects and Builders—Blueprints for Non-action, 18 Cath.U.L.Rev. 361, 372 (1969) (footnote omitted)):

The legislatures by enacting these statutes simply abolished all right of action against architects and builders in certain instances. * * * [A]s to claims accruing after the statutory period has run, the enactments are statutes of limitations in form only, while in essence they are substantive legislative acts defining rights—*i. e.*, that no right of action against the architect or contractor exists at all.

**28.** The New Jersey statute provides:

No action whether in contract, in tort, or otherwise to recover damages for any deficiency in the design, planning, supervision or construction of an improvement to real property, or for any injury to property, real or personal, or for an injury to the person, or for bodily injury or wrongful death, arising out of the defective and unsafe condition of an improvement to real property, nor any action for contribution or indemnity for damages sustained on account of such injury, shall be brought against any person performing or furnishing the design, planning, supervision of construction or construction of such improvement to real property, more than 10 years after the performance or furnishing of such services and construction. This limitation shall not apply to any person in actual possession and control as owner, tenant, or otherwise, of the improvement at the time the defective and unsafe condition of such improvement constitutes the proximate cause of the injury or damage for which the action is brought. [N.J.S.A. 2A:14–1.1]

In *Freezer Storage, Inc. v. Armstrong Cork Co.*, 382 A.2d 715, 721 (Pa. 1978), *affirming* 341 A.2d 184 (Pa.Super. 1975), the Court stated that "[t]he Legislature has not limited the recovery available under a cause of action [which would violate the Constitution of the State of Pennsylvania, Art. III § 18] but eliminated that cause of action altogether in certain cases." In *Freezer*, the Pennsylvania statute provided that no action could be brought against persons furnishing the design or construction of improvements to real property more than twelve years after the completion of such improvements. 341 A.2d at 185. Other states have characterized such statutes as grants of immunity [29]. Immunity from suit is substantive law for choice of law purposes. *See LaChance v. Service Trucking Co.*, 215 F.Supp. 162, 164 (D.Md. 1963); *Tobin v. Hoffman*, 202 Md. 382, 392, 96 A.2d 597 (1953) [30].

Seemingly, only one court has held a similar statute to be procedural. *Regents of the University of California v. Hartford Accident and Indemnity Co.*, 21 Cal.3d 624, 147 Cal.Rptr. 486, 581 P.2d 197 (Cal.1978). That case did not involve a choice of law question, but rather involved the question of whether or not a surety could enjoy the protections of that statute. Justice Tobriner wrote (at 206–07; footnotes omitted):

**29.** *Carter v. Hartenstein*, 455 S.W.2d 918, 920 (Ark.1970), *appeal dismissed for want of a substantial federal question*, 401 U.S. 901, 91 S.Ct. 868, 27 L.Ed.2d 800 (1971); *Fujioka v. Kam*, 514 P.2d 568, 570 (Haw.1973); *Skinner v. Anderson*, 231 N.E.2d 588, 591 (Ill.1967); *Pacific Indemnity Co. v. Thompson-Yaeger, Inc.*, 260 N.W.2d 548, 555 (Minn.1977); *Broome v. Truluck*, 241 S.E.2d 739, 740 (S.C.1978); *Kallas Millwork Corp. v. Square D Co.*, 225 N.W.2d 454, 455 (Wis.1975). The constitutional issues are addressed *infra* at pp. 35–40.

**30.** Plaintiff has argued that because § 5–108 was entitled a "statute of limitations" that it must be deemed procedural. The Court of Appeals of Maryland has stated that "the title of an act" is relevant to ascertain intent and purpose "where the statute is of doubtful meaning." *State Comm'n on Human Relations v. Baltimore*, 280 Md. 35, 41, 371 A.2d 645 (1977). *See MTA v. Baltimore County Revenue Authority*, 267 Md. 687, 695–96, 298 A.2d 413 (1973).

With judicial recognition that under some circumstances causes of action for negligence, product liability, or breach of warranty may not arise until discovery, the Legislature has responded by enacting statutes of limitation which require suit be filed within the shorter of two periods, one measured from the date of discovery and a second, longer period measured from the event giving rise to the cause of action. Section 337.15, read together with Code of Civil Procedure sections 337 and 338, enacts such a two-step limitation: actions founded upon a latent defect in the development of real property must be filed within three or four years of discovery, depending on whether the action rests on breach of warranty or negligence, but in any case within ten years of the date of substantial completion of the improvement. To classify such two-step statutes as substantive entails a variety of consequences, not only with respect to suretyship doctrine, but also in connection with questions of choice of law, pleading, and waiver. [Citation omitted.] We have no reason to believe that the Legislature in the instant enactment intended such novel collateral consequences or contemplated anything other than an ordinary, procedural statute of limitation.

The California statute [31], however, does

The Maryland Constitution provides that every law enacted must embrace but one subject and be described in its title. Art. III § 29. The mere name "statute of limitations," however, does not seem to be dispositive of the substance/procedure dichotomy for choice of law purposes. The statutes of limitations for wrongful death actions are "limitations" periods in the traditional sense, but because they operate on the right and not merely the remedy, they are deemed substantive. The question here is not "title" but rather is manner of operation of the statute.

**31.** The California statute, Cal.Civ.Proc.Code § 337.15 (West 1978 Supp.), provides as follows:

(a) No action may be brought to recover damages from any person who develops real property or performs or furnishes the design, specifications, surveying, planning, supervision, testing, or observation of construction

not function in the same manner as the Maryland and District of Columbia statutes. Under Maryland or District of Columbia law, if a cause of action arises on the 364th day of the ninth year, the injured plaintiff still has the normal three year limitations period in which to file suit.[32] By contrast, under the California statute, if the injury occurs on the 364th day of the ninth year, the plaintiff has one day to file suit, or else he will be time-barred. Thus, the California statute would seem to operate on filing times as do traditional limitations statutes, whereas the District of Columbia and Maryland statutes provide time before the normal filing times begin to run and thus limit the right itself.

■ In sum, this Court concludes that the Court of Appeals of Maryland would view D.C.Code § 12–310 as a substantive grant of immunity and that that Court should accordingly apply the District of Columbia statute in this case pursuant to the principle of lex loci delicti.

B. *Applicability of section 12–310 to Plaintiff*

Plaintiff contends that even if section 12–310 is substantive law, it does not bar plaintiff's claims because (1) plaintiff seeks damages for the design and construction deficiencies themselves rather than for injuries "resulting from" those deficiencies, (2) plaintiff suffered injury at the time the deficiencies were incorporated into the building and thus within the ten-year period of section 12–310, even though plaintiff did not discover that injury until a later date (*see Harig v. Johns-Manville Co.*, 284 Md. 70, 394 A.2d 299 (1978), and (3) plaintiff's cause of action against the architects is based on contract, as is the plaintiff's claim against Beauchamp.

■ In maintaining that it seeks damages for the design and construction deficiencies themselves rather than for injuries "resulting from" those alleged deficiencies, and that section 12–310 is not applicable herein, plaintiff is attempting to draw a distinction between section 12–310 and similar statutes in other states. Those other statutes expressly provide that claims for any design or construction deficiencies as well as claims for injuries resulting from such deficiency are barred after the relevant time period. Section 12–310 refers only to claims for resulting injuries as barred, and, unlike the other statutes, expressly excepts actions based upon contracts. The answer to those contentions of plaintiff, however, is that, while Georgetown may seek damages for the deficiencies themselves in an action based upon Georgetown's contracts with the architects and contractor,[33] plaintiff's tort claims are precisely the type of "action to recover damages for * * * (ii) injury to real or personal property * * * resulting from the defective or unsafe condition of an improvement to real property" specified in section 12–310.

■ Georgetown next asserts that it suffered injury when the defect was incorporated into the building and the building was certified by the architects. Characterizing its claim as one against the architects and builders for professional malpractice, *see Steelworkers Holding Co. v. Menefee*, 255 Md. 440, 443, 258 A.2d 177 (1969), Georgetown urges that the discovery rule applies and that therefore the running of the limitations period was tolled until plaintiff actually discovered the injury in September 1976. The answer, however, is that

or construction of an improvement to real property more than 10 years after the substantial completion of such development or improvement for any of the following:
 (1) Any latent deficiency in the design, specification, surveying, planning, supervision, or observation of construction or construction of an improvement to, or survey of, real property.
 (2) Injury to property, real or personal, arising out of any such latent deficiency.

**32.** *See* Revisor's Note to § 5–108, *supra*; 113 Cong.Rec. 28157 (1967), discussing predecessor bill of § 12–310.

**33.** Georgetown has not alleged a breach of contract by the architects. The contract claims against Beauchamp are discussed in Part III, *infra*.

if the mere incorporation of a defect constitutes an injury for which plaintiff need not claim within the time limits of section 12–310, even though the resulting damage is not discovered until many years after the ten-year period in section 12–310 has run, then the whole purpose of section 12–310 and similar statutes—to provide builders and design professionals with a finite period of risk for any one project—would be vitiated.[34]

Georgetown lastly asserts that its claims are "based on a contract" and therefore are outside the strictures of section 12–310. See section 12–310(b)(1).[35] Section 12–310 does not extend to causes of action sounding in contract. However, with regard to the architects, Georgetown has not invoked its contract. If the contract exception means only that the mere existence of a contract between the owner and builder is equivalent to having a suit "based on a

---

**34.** The legislative history of § 12–310 includes a statistical analysis of claims filed against architects and builders as distributed over length of time after completion of the structure. That analysis demonstrated that 84.3% of the claims arose within four years of completion of the project. 118 Cong.Rec. 36941 (1972). See also Comment, Limitation of Action Statutes for Architects and Builders—Blueprint for Non-action, 18 Cath.U.L.Rev. 361, 367 (1969), in which the author indicates that 99.6% of the claims arose within ten years of completion of the project.

In Rosenberg v. Town of North Bergen, 293 A.2d 662 (N.J.1972), Judge Mountain, reviewing the development of such statutes, wrote (at 664–65):

This statute, N.J.S.A. 2A:14–1.1, took effect May 18, 1967. The available materials touching its legislative history are meager and unrevealing. We are aware, however, that between 1964 and 1969 some thirty states adopted identical or similar statutes. [Citation omitted.] Other states have since done likewise.

It appears probable that two rather recent but unrelated developments in the law may well have provided the motivation for this widespread legislation. The common result of the developments to which we refer has been to enlarge very appreciably the area of potential liability to which architects and building contractors, among others, may be liable. We think it likely that these statutes are a legislative response seeking to delimit this greatly increased exposure. In order to afford background against which to discern more clearly what may have been the legislative intent in passing this act, we take brief note of these two changes in the law as they have come about here in New Jersey.

The first of these developments has taken place in the field of limitation of actions and is commonly referred to as the "discovery" rule. * * *

＊　　＊　　＊　　＊　　＊　　＊

This rule which decrees that in appropriate cases a statute of limitations shall not be deemed to run until a wrong has been discovered or should have been discovered, fosters the just result of protecting those who have

suffered injury from losing a right to redress because of ignorance of the wrong done. In achieving this salutary result the rule does, however, necessarily prolong the potential exposure of wrongdoers and of those who may be thought to be wrongdoers. In the case before us, for instance, the contractors who repaved Bergenline Avenue are being required to defend an action for damages more than thirty years after their work was completed.

The second development in the law which we think may have provoked this legislation is the recently adopted rule that an architect's or a contractor's liability for negligent planning or construction will not terminate, as a matter of law, upon the work having been completed and accepted by the owner or employer. In Totten v. Gruzen, 52 N.J. 202, 245 A.2d 1 (1968) this Court so held, rejecting the earlier "completed and accepted" rule * * *.

In Allentown Plaza Associates v. Suburban Propane Gas Corp., 43 Md.App. 337, 405 A.2d 326 (1979), the contention was advanced that § 5–108 changed established law so as to make the discovery rule applicable in a suit for breach of contract. Judge Moore, in the course of holding that the issue need not be decided in Allentown Plaza, noted (at 344, 405 A.2d 326) that "there is a question as to whether * * * the language of subsection (c) [of § 5–108 as printed in the 1974 volume] constitutes an adoption by the Legislature of the 'discovery rule' in the absence of specific language to that effect. Pacific Indemnity Co. v. Thompson-Yaeger, Inc., 258 N.W.2d 762 ([Minn.] 1977)." The Supreme Court of Minnesota, in a subsequent appeal of the Pacific Indemnity case, commented (260 N.W.2d 548, 554 (Minn.1977)), as had the New Jersey Court in Rosenberg, that statutes such as §§ 5–108 and 12–310 were legislative responses to the "greatly increased exposure of architects, engineers, and contractors over an extended period of time" resulting from the combination of the discovery rule and the "rule of liability to third parties on the part of building contractors * * *."

**35.** See n. 20 supra.

contract," then section 12–310(b)(1) would render the statute meaningless, because virtually all relationships between owners and architects or builders are founded upon an express or implied contract. It is also to be noted that section 12–310(a)(2)(B) states that the date of completion of an improvement is the earlier of the date of first use or the date "it is first available for use after having been completed in accordance with the *contract* * * *." [36]

██ The legislative history of section 12–310 states: "The limitation on actions provided in the bill does not apply to or affect the owner's contract or the warranties of an architect, contractor, or engineer in relation to the improvement." 113 Cong. Rec. 28158 (1967). The simple meaning of section 12–310 and of that statement is that the owner may pursue his contractual remedies without regard to the provisions of section 12–310. Since the discovery rule has not been extended under District of Columbia (or Maryland) law to contract actions, the regular statutes of limitations for contracts, sealed instruments or warranties provide for certain dates when liability ends. [37]

For the reasons set forth *supra*, this Court concludes that section 12–310 is fully applicable in the within case.

### C. *Constitutionality of section 12–310*

The constitutionality of section 12–310 is challenged herein under the equal protection principles embodied in the Due Process Clause of the Fifth and Fourteenth Amendments. The question arises as to whether the different treatment accorded to builders, architects, engineers, and other design professionals engaged in improvements to real property on the one hand, and owners, occupiers and suppliers on the other hand, is valid. The former group is benefited by the limitation on liability granted by section 12–310; the latter group is not so benefited, and the liability of its members is not so limited. *See* section 12–310(b)(2). A number of state courts have held that similar statutes violate their *state* constitutions on the grounds that such classifications are irrational and violative of equal protection. [38]

██ Most federal courts which have considered such statutes in the context of *federal* constitutional attacks seem to have rejected those challenges. [39] The United

---

**36.** *See* n. 20 *supra*.

**37.** Georgetown has further characterized its claim against the architects as one for negligent breach of contract and thus "based on a contract" and outside the scope of § 12–310. Such a construction gives Georgetown the best of both worlds. The invocation of "contract" gets the action out from under § 12–310, and "negligent breach" implies that the discovery (tort) rule applies. While the argument has certain appeal, it may not prevail because the contract exception was not intended to be so broad as to swallow the entire statute. Georgetown cites *Mumford v. Staton, Whaley and Price*, 254 Md. 697, 255 A.2d 359 (1969) for the proposition that an action for negligent breach of contract is essentially contractual in nature. To the contrary, *Mumford* states that the action is essentially one for negligence (at 714, 255 A.2d 359):

It would appear that in recent years the trend has been for courts, in applying limitations to professional malpractice cases, not to become too concerned as to whether the action is grounded in contract or tort, but rather to focus attention on the fact that it is the failure to perform one's professional duties with reasonable skill and diligence which gives

rise to the cause of action, whether it be a negligent breach of contract or otherwise. Since such actions share the common gravamen of negligence, limitations should be applied in the same manner to all suits for professional malpractice, even though the relationship between the parties be contractual, as in the case at bar.

**38.** *See* n. 29 *supra* (citing cases) and *Loyal Order of Moose v. Cavaness*, 563 P.2d 143 (Okla.1977). Two other state courts have held similar statutes violative of other provisions of state constitutions. *Bagby Elevator and Electric Co. v. McBride*, 291 So.2d 306, 312 (Ala. 1974) (improper title on statute); *Saylor v. Hall*, 497 S.W.2d 218, 222 (Ky.1973) (legislature cannot abolish certain rights which existed when the statutory provisions were enacted).

**39.** In *Smith v. Allen-Bradley Co.*, 371 F.Supp. 698, 701 (W.D.Va.1974), Chief Judge Turk wrote, in the course of rejecting, *inter alia*, a federal due process contention:

Plaintiff's argument is that the application of § 8–24.2 in this case bars a cause of action before it has accrued and as such prevents any hearing for redress of an alleged wrong

States Supreme Court, on an appeal from a decision of the Supreme Court of Arkansas rejecting an equal protection attack on such a statute based on the state and federal constitutions, dismissed the case for want of a substantial federal question. *Carter v. Hartenstein*, 401 U.S. 901, 91 S.Ct. 868, 27 L.Ed.2d 800 (1971). A summary dismissal of a case for want of a substantial federal question is a decision by the United States Supreme Court on the merits of that case which this Court is not free to disregard. *Hicks v. Miranda*, 422 U.S. 332, 344, 95 S.Ct. 2281, 2285, 45 L.Ed.2d 223 (1975). Moreover, "[s]ummary actions * * * should not be understood as breaking new ground but as applying principles established by prior decisions to the particular facts involved." *Mandel v. Bradley*, 432 U.S. 173, 176, 97 S.Ct. 2238, 2241, 53 L.Ed.2d 199 (1977) (*per curiam*).

After "applying principles established by prior [Supreme Court] decisions," this Court concludes that section 12–310 is constitutional. Section 12–310 is an economic regulation and does not focus on either a fundamental right or a suspect class. It therefore does not merit strict scrutiny and passes muster under the rational basis test. *See McLaughlin v. Florida*, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964) (race in-

volved); L. Tribe, American Constitutional Law §§ 16–2, 16–6, and cases cited therein.[40] In *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 314, 96 S.Ct. 2562, 2567, 49 L.Ed.2d 520 (1976) (*per curiam*) (dealing with forced retirement of state policemen at age fifty), the Supreme Court stated (footnote omitted):

We turn then to examine this state classification under the rational-basis standard. This inquiry employs a relatively relaxed standard reflecting the Court's awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one. Perfection in making the necessary classifications is neither possible nor necessary. *Dandridge v. Williams*, [397 U.S. 471], 485 [1970] * * *. Such action by a legislature is presumed to be valid.[41]

In *Silver v. Silver*, 280 U.S. 117, 122, 50 S.Ct. 57, 58, 74 L.Ed. 221 (1929), the Court, in upholding the constitutionality of a Connecticut automobile guest statute, stated in an opinion by Mr. Justice Stone that "the Constitution does not forbid the creation of new rights, or the abolition of old ones recognized by the common law, to attain a permissible legislative object." *See also, Sanner v. Trustees of Sheppard and Enoch*

---

committed by a private party. The answer to this is simply that the legislature, in its infinite wisdom may, within limits of rationality, determine what are actionable wrongs and the time limits within which lawsuits must be brought to redress such wrongs.

In *Agus v. Future Chattanooga Development Corp.*, 358 F.Supp. 246, 251 (E.D.Tenn.1973), Chief Judge Wilson noted:

It is not the office of this Court to inquire into the wisdom or underlying motives of state legislatures in framing such statutes and the Court declines to do so. * * *

While the issue has not been specifically raised, it is noted that statutes of limitations * * * which in some instances may serve to cut off or extinguish a right of action before it arises or before the injury occurs have been scrutinized and found to be constitutionally valid by this Court on other occasions. [Citation and footnote omitted.]

In *Carter v. Hartenstein*, 455 S.W.2d 918, 921 (Ark.1970), *appeal dismissed for want of a substantial federal question*, 401 U.S. 901, 91 S.Ct. 868, 27 L.Ed.2d 800 (1971), the Supreme Court of Arkansas stated that

a vital distinction, nonetheless, exists between owners or suppliers and those engaged in the professions and occupations of design and building. This is not arbitrary or unreasonable. It is a legitimate and practical exercise of the legislative function.

*But see Fujioka v. Kam*, 514 P.2d 568 (Hawaii 1973); *Loyal Order of Moose v. Cavaness*, 563 P.2d 143, 148 (Okla.1977); *Broome v. Truluck*, 241 S.E.2d 739, 740 (S.C.1978), in which federal and/or state equal protection analyses are involved.

**40.** Nor does it require an in-between type scrutiny. *See, e. g., Craig v. Boren*, 429 U.S. 190, 197, 97 S.Ct. 451, 456, 50 L.Ed.2d 397 (1976).

**41.** In addition, *see McGowan v. Maryland*, 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961) (involving Maryland's Sunday closing laws), in which Mr. Chief Justice Warren stated that "[a] statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it."

*Pratt Hospital*, 278 F.Supp. 138, 141–44 (D.Md.), *aff'd*, 398 F.2d 226 (4th Cir.), *cert. denied*, 393 U.S. 982, 89 S.Ct. 453, 21 L.Ed.2d 443 (1968). In *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364, 93 S.Ct. 1001, 1006, 35 L.Ed.2d 351 (1973), Mr. Justice Douglas stressed, in the course of denying a challenge to an Illinois law imposing liability for ad valorem personal property taxes on corporations and other entities but not on individuals, that the party challenging a classification has a heavy burden " 'to negative every basis which might support it' " (*quoting from Madden v. Kentucky*, 309 U.S. 83, 88, 60 S.Ct. 406, 408, 84 L.Ed.2d 590 (1940)). *See also United States v. Maryland Savings-Share Insurance Corp.*, 400 U.S. 4, 7, 91 S.Ct. 16, 18 (1970) (relating to a cut-off date provision in a federal tax statute).

In *Freezer Storage, Inc. v. Armstrong Cork Co.*, 382 A.2d 715, 718–19 (Pa.1978), Justice Roberts, in an opinion upholding the constitutionality under the Pennsylvania Constitution of a statute similar to section 12–310,[42] wrote (at 718–19; footnote omitted):

> It is manifestly rational to adjust time periods for liability for acts performed according to the substantive scope of the liability involved. The scope of liability of the class of builders differs significantly from that of the class of owners. First, the class of persons to whom builders may be liable is larger than the class to which owners may be liable. Landowners may be liable to others who come onto their land. Builders, however, may be liable both to the landowners and to others who use the land. Second, a builder may be liable for construction defects

under various legal theories—contract, warranty, negligence, and perhaps strict liability in tort. Landowner liability for such defects, on the other hand, typically lies only in tort, unless the landowner is a lessor, in which case he is liable only for events occurring while the tenant is in possession. [Citation omitted.] Third, landowners can ordinarily avoid liability by taking adequate care of their land and structures and by regulating the number and type of persons entering the land and regulating the conditions of entry. The builder has no such control over his product after relinquishing it to the landowner. Landowner's liability is also controlled by the myriad of common law rules limiting liability to such classes as "undiscovered trespassers," "mere licensees" and so forth. Builder's insurance and owner's insurance structures and pricing are also different. For any of these reasons the Legislature might rationally conclude that builders should remain liable for their mistakes for only 12 years after they complete construction, but that a landowner should remain liable for injuries caused on his land for as long as he is in possession. [Citation omitted.]

Appellant also suggests that this statute is invalid because it exempts builders but not suppliers from liability twelve years after a building is completed. As amicus points out, there are no cases on whether suppliers are ever to be classed as persons "lawfully performing . . . the design, planning . . . or construction of [improvements to real property]." However, assuming arguendo that suppliers are not within the class of builders, the distinction drawn between the two classes is rational. Suppliers, who typically pro-

---

**42.** The Pennsylvania statute, Pa.Stat.Ann. Tit. 12, § 65.1 (Supp.1978), provides as follows:

§ 65.1 Twelve years

No action (including proceedings) whether in contract, in tort or otherwise, to recover damages:

(1) For any deficiency in the design, planning, supervision or observation of construction or construction of an improvement to real property,

(2) For injury to property, real or personal, arising out of any such deficiency,

(3) For injury to the person or for wrongful death arising out of any such deficiency, or

(4) For contribution or indemnity for damages sustained on account of any injury mentioned in clauses (2) and (3) hereof shall be brought against any person lawfully performing or furnishing the design, planning, supervision or observation of construction, or construction of such improvement more than twelve years after completion of such an improvement.

duce items by the thousands, can easily maintain high quality-control standards in the controlled environment of the factory. A builder, on the other hand, can pre-test his designs and construction only in limited ways—actual use in the years following construction is their only real test. Further, every building is unique and far more complex than any of its component parts. Even in the most uniform-looking suburban subdivision, each house stands on a separate plot of land; each lot may have slightly different soil conditions; one may be near an underground stream; and so forth. The Legislature can rationally conclude that the conditions under which builders work are sufficiently difficult that limitations should be placed on their liabilities, but not on the liabilities of suppliers.

The legislative history of section 12–310 shows that Congress focused upon the concerns raised by Justice Roberts. 118 Cong. Rec. 36939 (1972). Congress considered the interest of owners and third parties along with statistical studies of the distributions of claims over and during time periods. 118 Cong.Rec. 36941 (1972).[43]

In sum, this Court concludes that the classifications constructed by section 12–310 are rational, and that section 12–310 does not violate any provisions of the federal constitution.

### D. Conclusion

Section 12–310 defines the point in time which initiates the running of the ten year liability period as the "date the improvement was substantially completed." Section 12–310 further provides:

(2) For purposes of this subsection, an improvement to real property shall be considered substantially completed when—

(A) it is first used, or

(B) it is first available for use after having been completed in accordance with the contract or agreement cover-

ing the improvement, including any agreed changes to the contract or agreement,

whichever occurs first.

The legislative history and the statute itself indicate that "first use," even when prior to completion of all the contract details, triggers the ten-year period. In this case it is stipulated that four floors of Harbin Hall were occupied on September 23, 1964. Therefore, the ten-year period expired on September 23, 1974. The alleged injury, first observed by plaintiff on September 8, 1976, more than twelve years after the initial use of Harbin Hall, did not give rise to a cause of action in tort. Because the alleged injury did not become apparent until after the ten year period had run, Georgetown never had and does not have now any cause of action in tort based on that alleged injury.

As Georgetown has no tort claims, the motions for summary judgment with regard to the tort claims stated by Georgetown against defendants Madden, Walden, Auerbach, Scullen and Marchigiani, and Beauchamp are hereby granted. For the same reasons, summary judgment on the tort claims stated against defendant Anchor, by Georgetown, will be granted even though Anchor has not formally moved for summary judgment.[44]

### III. Beauchamp's Motion for Summary Judgment as to the Construction Contract

Beauchamp has moved for summary judgment as to the claims made against it by Georgetown. For the reasons set forth in Part II, supra, summary judgment will be granted in favor of Beauchamp with regard to the tort claims stated against Beauchamp by Georgetown. As to the claims made against Beauchamp by Georgetown under the bond, see Part V hereof. In this Part of this opinion, i. e., Part III, the issues considered relate to the claims made by Georgetown against Beauchamp under the construction contract.

---

**43.** See n. 34 supra.

**44.** See n. 17 supra.

Beauchamp contends that the construction contract between itself and Georgetown was not under seal, and that any action based on that contract is therefore barred by limitations. The parties seemingly agree that if the construction contract is not a sealed instrument, then the applicable limitations period is three years. *See* Md. Ann.Code, Cts. & Jud.Proc. Art. § 5–101; D.C.Code § 12–301(7). The parties seemingly further agree that if the construction contract is a sealed instrument, the applicable limitations period is twelve years. *See* Md.Ann.Code, Cts. & Jud.Proc. Art. § 5–102(a)(2); D.C.Code § 12–301(6). All of that is true whether Maryland or District of Columbia law is applicable.

For reasons set forth *infra*, this Court concludes that the construction contract between Beauchamp and Georgetown is not a sealed instrument, that that contract was subject to a three-year statute of limitations, and that Georgetown's suit against Beauchamp on that contract is therefore barred by limitations.[45]

Preliminarily, the question arises as to what law governs the determination of whether or not the contract is a sealed instrument. The contract was made in the District of Columbia. However, in *General Petroleum Corp. v. Seaboard Terminals Corp.*, 23 F.Supp. 137, 137–38 (D.Md.1938), and *General Petroleum Corp. v. Seaboard Terminals Corp.*, 19 F.Supp. 882, 884–85 (D.Md.1937), Judge Chestnut indicated that he would follow Maryland law, *i.e.*, the law of the forum, regarding what is a sealed instrument in applying the Maryland statute of limitations. *See also Alropa Corp. v. Rossee*, 86 F.2d 118, 119 (5th Cir. 1936), in which the Court stated that the forum's law would be applied to determine, in a limitations context, if the contract was sealed, though the law of the place of contracting

would be applied if the question of whether the document was sealed involved a substantive right such as "the sufficiency of the instrument as title."

The parties have all taken the position, despite the case law cited in the preceding paragraph, that District of Columbia law is applicable in considering the question of whether the construction contract between Georgetown and Beauchamp was sealed. This Court does not agree. However, the determination of whether Maryland or District of Columbia law controls in that regard is of little import herein since there seemingly are no significant differences between Maryland and District of Columbia law on the subject of what constitutes a sealed instrument. *Compare Fox-Greenwald Sheet Metal Co. v. Markowitz Bros., Inc.*, 452 F.2d 1346, 1357 n.68 (D.C.Cir.1971), *Sigler v. Mount Vernon Bottling Co.*, 158 F.Supp. 234 (D.D.C.), *aff'd*, 261 F.2d 378 (D.C.Cir.1958) (*per curiam*), and *Brown v. Commercial Fire Insurance Co.*, 21 App.D.C. 325, 335–37 (1903) (citing Maryland law) *with Mayor and Council of Federalsburg v. Allied Contractors, Inc.*, 275 Md. 151, 155–57, 338 A.2d 275, *cert. denied*, 423 U.S. 1017, 96 S.Ct. 452, 46 L.Ed.2d 389 (1975), *Gildenhorn v. Columbia Real Estate Title Insurance Co.*, 271 Md. 387, 397–406, 317 A.2d 836 (1974), and *Smith v. Woman's Medical College*, 110 Md. 441, 444–46, 72 A. 1107 (1909).

The question of whether the construction contract involved herein was sealed has been thoroughly briefed. Additionally, this Court has heard conflicting testimony from experienced attorneys who appeared as expert witnesses with regard to custom and understanding concerning sealed instruments in the District of Columbia in 1962 or thereabout.[46] The parties have stipulated that none of the signatories of the construc-

---

**45.** Although the defendant architects and possibly Scullen and Marchigiani had contracts with plaintiff, none of the contracts either appears to be or has been alleged to be under seal. Therefore, although outside the scope of § 12–310, the regular three-year limitations period applies. As three years since June 2, 1966 had long since passed when this suit was filed, any actions based on such contracts would be barred by limitations. In that regard, it is to be noted that Georgetown has not alleged, and seemingly cannot meritoriously claim, a direct contractual relationship with Anchor.

**46.** Although this Court offered to hear similar testimony with regard to Maryland law, none of counsel desired to present the same.

tion contract between Georgetown and Beauchamp remembers the events surrounding the signing of that contract. Thus, this Court need not decide the question of whether extrinsic evidence of intent other than the above-referred-to testimony as to custom and understanding is admissible in ascertaining whether or not the parties intended the contract to be under seal as a specialty.[47] Rather, the only evidence of the intent of the parties is the contract itself in the context of modern use of seals.[48]

The signature page of the construction contract between Beauchamp and Georgetown[49] discloses that the word "(Seal)" appears above the word "ATTEST:" to the left of "President and Directors of Georgetown College." The contract is signed by Gerard J. Campbell, S.J., for Georgetown. To the left of his signature is that of Joseph A. Sellinger, S.J., secretary, and Mary Joy Shields, witness. It is over the signature of the former that "(Seal)" and "ATTEST:" appear. The corporate seal of Georgetown is impressed over the word "(Seal)" which,

**47.** *Compare Sigler v. Mount Vernon Bottling Co.*, 261 F.2d 378, 379 (D.C.Cir.1958) (*per curiam*) *with General Petroleum Corp. v. Seaboard Terminals Corp.*, 23 F.Supp. at 139; *Mayor and Council of Federalsburg v. Allied Contractors, Inc.*, 275 Md. at 155–56, 338 A.2d 275.

**48.** There are no disputed facts before this Court with regard to the sealing issue, other than the differences among the District of Columbia attorney-witnesses. If there were, the question of whether it is for court or for jury to determine whether a given instrument is a sealed specialty might require resolution. *Compare Sigler v. Mount Vernon Bottling Co.*, 158 F.Supp. at 235 *with Gildenhorn v. Columbia Real Estate Title Insurance Co.*, 271 Md. at 398, 317 A.2d 836. But that question is not presented herein because the parties agreed to present the issue for decision by the Court. If the issue is one of fact or if it is one of mixed fact and law, then the burden would appear to be on Georgetown to prove by a preponderance of the evidence that the contract was intended by the parties to be a sealed instrument. That burden has not been borne by Georgetown, for the reasons indicated in the body of this opinion, in which the issue is analyzed as one of law, and for the further following reasons: (1) if the District of Columbia law applies, the

opinion expressed by the attorney who concluded the instrument was not sealed in the light of prevailing custom, practice and understanding among knowledgeable lawyers practicing in the District of Columbia in 1962 was far more persuasive than that of the District of Columbia attorney who testified to the contrary; and (2) if Maryland law is applicable, the understanding of the undersigned member of this Court who was engaged in the practice of law in Maryland in 1962 and whose own knowledge was gained from a type of practice which almost continuously involved business-type contracts from 1948 to 1966 is that the use of the word "(Seal)" and the impression of the corporate seal would not have been intended by knowledgeable lawyers or knowledgeable parties in Maryland during that period to constitute a sealed specialty. It is to be noted that none of the parties accepted the opportunity offered to them to produce evidence concerning Maryland custom in 1962 with regard to those matters. *See* n.46 *supra.*

**49.** IN WITNESS WHEREOF, the parties to these presents have executed this contract in six (6) counterparts, each of which shall be deemed an original, in the year and day first above mentioned.

(Seal)
ATTEST:

President and Directors
of Georgetown College
(Owner)

/s/ Joseph A. Sellinger, S.J.
(Secretary)

By /s/ Gerard J. Campbell, S.J.

/s/ Mary Joy Shields
(Witness)

(Seal)

Victor R. Beauchamp
Associates, Incorporated
(Contractor)

/s/ Robert C. Blatzheim
(Secretary)

By /s/ Edward M. Crough
Edward M. Crough, President

/s/ Martha Turner
(Witness)

431 Cedar Street, N. W., Washington 12, D. C.
(Address)

as indicated above, appears over the name of Fr. Sellinger, secretary.

The word "(Seal)" further appears on the left side below the signature of Ms. Shields and to the left of "Victor R. Beauchamp Associates, Inc." The contract is signed by Edward M. Crough, President, for Beauchamp Associates. To the left of Mr. Crough's signature is the signature of Robert C. Blatzheim, Secretary. Below Mr. Blatzheim's signature is that of Martha Turner, witness. A corporate seal is impressed on the right side of the page over the signature of Mr. Crough.

The document submitted in this case is one of six original copies which were executed. The parties apparently have no knowledge of what has happened to the other five copies. Nor do they have any knowledge as to whether seals were affixed on one or more of those other five copies and, if so, where and how affixed.

Both parties rely upon *Sigler v. Mount Vernon Bottling Co.*, 158 F.Supp. 234 (D.D. C.), aff'd, 261 F.2d 387 (D.C.Cir.1958) (*per curiam*). In that case, Judge Pine dealt with the question of whether or not a promissory note was a sealed instrument. That question was determinative in that case: if the note was sealed, limitations would not bar the plaintiff; if the note was not sealed, limitations would bar the plaintiff. Judge Pine wrote as follows (at 235–36):

> The note herein was signed by defendant and its corporate seal impressed over a portion of its name. * * * The point for decision is the intention of the maker in causing its seal to be impressed on the note. Looking at the instrument itself, as I am enjoined to do, I find that it does not contain the words "signed and sealed" or words of similar import. If present, such words would be strongly indicative of an intention to create a specialty. Their absence is equally indicative of a contrary intention where, as here, a corporate seal is involved. Next, I find that a printed form of note in general use was utilized, but not one which contained the word "(Seal)" after the space for signature. This is indicative that a specialty was not intended by the maker, just as the use of a form containing the word "(Seal)" would indicate otherwise. Next, the note was made by a corporation and not an individual. The latter requires no seal for identification or as a mark of genuineness, which would be appropriate for a corporation. The presence of a seal, therefore, (either written or contained on the form used) has a connotation of intention to create a sealed instrument in the case of an individual which is not found in the case of a corporation using its own corporate seal. In the latter case, if the corporation-maker wishes some form of identification and genuineness on the note, its seal is a convenient form for that purpose. Furthermore, it is desirable, if not imperative, that a note be so drawn as to leave no doubt that the maker is the corporation bearing the name signed thereon and not someone trading thereunder. By reason of the foregoing circumstances, I am of the opinion that the intention of the maker was not to create a specialty with its attendant liability for twelve years, but that the seal was impressed for identification and as a mark of genuineness, and also to give certain knowledge that the note was an obligation of the corporation and no one else. * * *

In *Sigler*, Judge Pine (at 236) distinguished *Federal Reserve Bank of Richmond v. Kalin*, 81 F.2d 1003 (4th Cir. 1936), on the grounds that *Kalin* "did not involve a corporate seal but the word '(Seal)' opposite the signature of the maker." Judge Pine also (at 236) distinguished *Wells v. Alropa Corp.*, 82 F.2d 887 (D.C.Cir.1936), on the grounds that *Wells* "dealt with the note of an individual and not of a corporation." *See also Phillips v. A & C Adjusters, Inc.*, 213 A.2d 586 (D.C.1965), in which the signature of the maker of the note, an individual, was followed by "the printed word '(Seal).'" In that case, Chief Judge Hood, after writing that "[t]here is * * * no indication in the body of the contract that it is intended to be a sealed instrument," *id.* at 586, nonetheless "reluctantly" held on the authority of

*Wells* that the contract was under seal. Chief Judge Hood further noted that "we think it may fairly be assumed that appellant [the maker of the note, who was an individual and not a corporation] was totally ignorant of the meaning or purpose of the seal" and that the interpretation of the contract in that case as sealed was "an anachronism." *Id.* at 587.

Writing concerning sealed contracts involving a corporation—as opposed to a sealed contract signed by an individual in his individual capacity—Professor Williston has stated (1 Williston § 271A (1936) at 788–89; footnotes omitted):

> The chief value of the corporate seal now is as prima facie authentication that the document is the act of the corporation and that the officers who have executed it have been thereunto duly authorized. Under the modern view this function of the corporate seal * * * must be distinguished from its use as a general seal. For example, the mere fact that the corporate seal appears on the instrument other than in the usual place of the private seal would not make the instrument a deed or specialty in the absence of a recital of affixing the seal or of extrinsic evidence showing an intention to have it serve the function of a general seal. In other words, it is a question of fact in the specific case whether the corporation has employed its corporate seal as a general seal or whether it has adopted any other permissible form of seal as convenient for the particular occasion. These *general principles* respecting the corporate seal apply to both private and municipal corporations.

Professor Corbin, writing on the subject of seals in general, has spoken as follows (1A Corbin §§ 241–242 (1963) at 393–97; footnotes omitted):

> In executing a formal contract, the local custom and the local statute must be known and followed. It may be said that in general a document will be held to be under seal if it appears on the face of it that the party executing it intended it to be so. Among the forms of seal that are in use in most of the states are wax, a gummed wafer, an impression in the paper itself, the word "seal," the letters "L.S." * * *, a pen scrawl. Sometimes it has been held that the newer of these forms are not effective as a seal unless there is a witnessing clause stating that the document is under seal. * * *

> It has been sometimes thought that one purpose of a seal is to identify the party executing the instrument, thereby authenticating it as his very "act and deed." * * *

> \* \* \* \* \* \*

> Sealed documents commonly have an attesting, or "witnessing," clause: "In witness whereof I have hereunto set my hand and seal." Such a clause should always be included; it aids greatly in making proof of execution and in establishing the document as one under seal. But it is the attachment or adoption of the seal that is the operative fact, and not the inclusion of the testimonium clause * * *. Some cases have refused to infer the act of sealing from the mere presence of some kind of seal on the document, especially where it would be a legally operative document even if the seal were not there.

The word "(Seal)" printed beside an *individual's* signature has been held sufficient to render the document under seal even in the absence of an attestation clause. *See Wells v. Alropa Corp.*, 82 F.2d 887, 888 (D.C.Cir.1936); *Federal Reserve Bank of Richmond v. Kalin*, 81 F.2d 1003, 1006–07 (4th Cir. 1936).[50] On the other hand, the mere affixing of a *corporate* seal to a contract will not necessarily render that contract under seal, as the seal may be considered merely as authenticating the corporate act. *See Sigler v. Mount Vernon Bottling Co.*, 158 F.Supp. 234 (D.D.C.), *aff'd*, 261 F.2d 378 (D.C.Cir.1958) (*per curiam*); *Smith v. Woman's Medical College*, 110 Md.

---

**50.** *Kalin,* the maker of the note, was seemingly an individual. *Id.* at 1004.

441, 445, 72 A. 1107 (1909); 1 Williston § 271A at 788.[51]

■ A sealed instrument is not created by accident. The intent of the parties is what controls. One element upon which courts focus in determining intent is whether the body of the contract contains language referring to a seal. *See* 1A Corbin § 242 at 396–97. In *Gildenhorn v. Columbia Real Estate Title Insurance Co.*, 271 Md. 387, 397–406, 317 A.2d 836 (1974), Judge Smith stressed, in holding that certain insurance policies were specialties and subject to Maryland's twelve-year limitations statutory provision, the importance of a recital in the instrument that the contract was under seal. In so doing, Judge Smith wrote (at 398, 402–03, 317 A.2d 836):

> In the early law it was held that a corporation could not contract except under its corporate seal. This rule persisted, but was increasingly relaxed during the 19th century. Today, in the absence of charter or statute to the contrary, a corporation may bind itself by a writing not under seal to the same extent as an individual. As a result, the main purpose of the corporate seal now is as a *prima facie* authentication that the document is the act of the corporation and that the officers who have executed it have been thereunto duly authorized. This function of the corporate seal, however, must be distinguished from its use as a general seal. 2 S. Williston, *Contracts* § 271A (3d ed. Jaeger 1959) (citing *General Petroleum Corp. v. Seaboard Terminals Corp.*, supra); and 6 W. Fletcher, *Cyclopedia of the Law of Private Corporations* §§ 2466 and 2471 (rev. vol. Wolf 1968). The mere fact that the corporate seal appears on the instrument other than in the usual place of the private seal would not make the instrument a specialty in the absence of a recital affixing the seal or of extrinsic evidence showing an intention to have it serve the function of a general seal. In other words, it is a question of fact in any specific case as to whether the corporation has employed its corporate seal as a general seal or whether it has adopted any other permissible form of seal as convenient for the particular purpose. Williston, *op. cit.* § 271A (citing *General Petroleum Corp. v. Seaboard Terminals Corp.*, 23 F.Supp. 137 (D.Md.1938)).

\* \* \* \* \* \*

In 7 W. Fletcher, *op. cit.*, § 3021 (rev. vol. Wolf 1964) it is stated relative to execution of instruments by corporations:

> "Instruments formerly required to be under seal ..., where a corporation is a party thereto, should designate the corporation by its proper name as a party to the instrument, and it is customary and good form, after stating the corporate name, to add 'a corporation organized and existing under and by virtue of the laws of the state of,' naming the state where the company was incorporated.... [T]he usual con-

---

**51.** In *Smith v. Woman's Medical College, supra*, the Court wrote as follows (at 445–46, 72 A. 1107):

> As no reference is made in the body of the instrument sued on in this case to the corporate seal impressed thereon, and as there is nothing on the face of the paper to indicate that it was intended to be issued as a specialty, we think that unquestionably, under the previous decisions of this Court, as well as upon the authority of the text-writers quoted above, the instrument must be considered a simple contract obligation, and not a specialty.
>
> This view does not conflict with the decision of this Court in the case of *Trasher v. Everhart*, 3 G.&J. 246, relied upon by the appellant. In that case the instrument involved was executed by individuals in their private capacity, using a scroll at the end of their names as seals, and it was held that the scroll seal of the obligors rendered the instrument a specialty without any reference to the seal being made in the body of the instrument.
>
> Here we are dealing with an instrument executed for and in behalf of a corporation which according to the ancient rule of the common law could execute no contract apart from the instrumentality of its common seal. And while this ancient rule has been greatly modified, yet in order to render the written contract of a corporation to which the seal of the corporation is attached a specialty it must appear upon the face of the instrument that it was intended to be executed as such. *Jackson v. Meyers*, [43 Md. 452 (1876)]; 4 *Thompson, Corp.*, secs. 5051, 5053–5078.

cluding clause, where the corporation is the grantor, is some such form as 'In witness whereof, the said _____ company has hereunto caused this instrument to be executed in its name, on its behalf and under its corporate seal, by its president and secretary, this ____ day of _____, 19___' The name of the corporation should then be subscribed underneath, and the better form is for it to precede the names of the officers signing for the corporation, which should follow the name of the corporation, by some such word as 'Per' or 'By,' and of course the title of the office should follow the name. . . .

"It has been said that greater precision of form is required in case of sealed instruments than in case of simple and mercantile contracts." *Id.* at 89–91.

Similar comment is found in 1A A. Corbin, *Contracts* § 242 (1963). We note that 2 H. Wood, *Limitation of Actions* § 176a(2) (4th ed. Moore 1916) likewise states:

"A recital in an unsealed instrument that it is under seal makes the instrument a sealed one for the purpose of the statute of limitations. The mere attaching of a seal after the signature does not raise the presumption that a note is a sealed instrument, unless there be a recognition of the seal in the body of the instrument by some such phrase as 'Witness my hand and seal' or 'Signed and sealed;' and, in the absence of such circumstances, the seal is regarded merely as surplusage, and the character of the note is not changed." *Id.* at 824–25.

In *Fox-Greenwald Sheet Metal Co., v. Markowitz Bros., Inc.*, 452 F.2d 1346 (D.C. Cir.1971), Judge Robinson wrote (at 1357 n.68):

The note bore Fox-Greenwald's corporate seal but did not indicate, by recital or otherwise, that the execution of a sealed instrument was intended. In such circumstances, we accept the corporate seal only as a mark of identification and genuineness, and the twelve-year limitation on the enforcement of sealed instruments does not apply. [Citations omitted.] Rather, the three-year period applicable to "a simple contract, express or implied," [citation omitted] governed suit on the note.

Other authorities have concluded that an attestation clause is unnecessary in order for a contract to be under seal. *See Federal Reserve Bank v. Kalin*, 82 F.2d 1003, 1006 (4th Cir. 1936); Restatement [First] Contracts § 100. Those authorities, however, seemingly refer to contracts by individuals, and not to contracts by corporations.

Beauchamp contends that a "recital clause" (*i.e.*, "signed and sealed") is necessary and must appear in the body of the contract before that contract is under seal. While the authorities do not go so far as to indicate that a recital is *required* in order for a corporation to enter into a sealed contract, they do indicate that something more than the presence of the corporate seal is necessary, such as a recital, to render a contract a sealed instrument.

Georgetown contends that the presence of the word "(Seal)" should be a sufficient "other indication," *Simonson v. International Bank of Washington*, 312 F.2d 887, 887 (D.C.Cir.1963) (*per curiam*), to render the contract sealed. Georgetown relies on the following language from *Sigler v. Mount Vernon Bottling Co.*, 158 F.Supp. at 235–36, which involved a corporate contract:

* * *, I find that a printed form of note in general use was utilized, but not one which contained the word "(Seal)" after the space for signature. This is indicative that a specialty was not intended by the maker, just as the use of a form containing the word "(Seal)" would indicate otherwise. * * *

However, the Court did *not* say that such presence of the printed word "(Seal)" along with the imprinted corporate seal would conclusively establish that the contract was a sealed instrument. Moreover, in affirming the District Court in *Sigler*, the Court of Appeals stated: "Nowhere does the word or symbol 'Seal' or 'L.S.' appear; nowhere is

there a recital that the instrument is 'signed and sealed'." 261 F.2d at 379. And in *Brown v. Commercial Fire Insurance Co.*, 21 App.D.C. 325, 336 (1903), a case involving the question of whether an insurance policy was under the seal of the company, the Court wrote as follows:

> And in such cases, where the paper does not recite that it is signed and sealed, the impression of a seal has been considered as a mere mark of genuineness and nothing more. *Jackson v. Myers*, 43 Md. 452, 465 [1876].

The body of the contract here in question makes no recital to the effect that the contract is under seal. Professor Corbin stresses the importance of such a clause. 1A Corbin § 242 at 396. In *Brown v. Commercial Fire Insurance Co., supra, Gildenhorn v. Columbia Real Estate Title, supra*, and *Fox-Greenwald Sheet Metal Co. v. Markowitz Bros., Inc., supra*, the Courts focused upon the absence or the presence of any reference to the sealed nature of the instrument in the body of the contract. In *Brown*, as early as 1903, the Court referred (21 App.D.C. at 336) to the "modern tendency" towards minimizing the old distinctions between sealed and unsealed instruments. It is apparent that the parties to the present contract could easily have more clearly specified that the contract was to be a sealed instrument. The only fact which distinguishes this case from cases such as *Brown, Fox-Greenwald*, and *Simonson* is that those cases involved contracts on which there were only impressions of corporate seals, whereas in the within case, the word "(Seal)" appears twice on the contract. That appearance of the word "(Seal)" together with the impression of the corporate seal hardly constitute the "greater precision of form" referred to by Fletcher, as quoted in *Gildenhorn, see* p. 52 *supra*, as necessary for a corporation to create a sealed instrument. Rather, reliance on those factors would seem to be a reversion to old formalities.

The only effect of concluding that the present contract is under seal would be to extend the limitations period. The validity of the contract herein does not depend upon the use of seals. While no case appears to have decided the question of whether, for purposes of determining the applicable limitations period, the use of the word "(Seal)" together with the impression of corporate seals makes a contract a sealed instrument, in the absence of a clause in the body of the contract regarding the sealed nature of the contract, it would appear that such combined use of the word "(Seal)" and of such impressions should be considered insufficient by themselves to manifest an intent to render the contract under seal, particularly where such use of the word and of such impressions would serve no purpose other than to extend the statute of limitations. Rather, such use should be viewed as serving only as an authentication of corporate action when the same is deemed desirable. The parties to the contract were sophisticated. They could easily have specifically provided by so stating in the body of the contract that the contract was under seal. They did not do so. "[I]f a corporate seal is impressed on an agreement it will remain a simple contract unless * * * the body of the contract itself indicates that the parties intended to establish an agreement under seal * * *." *Mayor and Council of Federalsburg v. Allied Contractors, Inc.*, 275 Md. at 155, 338 A.2d 275. There is no such indication in the body of the contract at issue herein, and no extrinsic evidence to show an intent that the contract was to be a specialty, *id.* at 155–56, 338 A.2d 275. Under the circumstances, this Court concludes that the construction contract between Beauchamp and Georgetown was not a sealed contract, that the applicable limitations period was three years, and that the contract suit by Georgetown against Beauchamp based on the construction contract was therefore not timely filed. Accordingly, summary judgment will be granted for Beauchamp as to the contract claims made by Georgetown under the construction contract.[51]

---

51. The uses of the word "(Seal)" in the bond—an instrument which is in any event a specialty under either Maryland or District of Columbia law—strongly suggest authentication of a cor-

Beauchamp also seeks summary judgment in connection with the claims against it by Georgetown under the bond. For reasons set forth in Part V of this opinion, that motion will not be granted.

## IV. The Motion to Dismiss the Cross-claim of Reliance against Beauchamp

 Defendant-trustee Crough, as Trustee of Beauchamp, has moved pursuant to Federal Civil Rule 12(b) to dismiss Reliance's cross-claim against Beauchamp. The question presented by that motion is whether Reliance (the surety) may assert a claim against Beauchamp (the principal) for indemnification and/or exoneration, in light of the conclusion of this Court that Georgetown (the obligee) may not directly sue Beauchamp under the construction contract.[52] This Court concludes that the con-

tractual relationship between Beauchamp and Reliance and the principles of suretyship law lead to the conclusion that Reliance may at this time assert a cross-claim or third-party claim against Beauchamp for indemnification and exoneration.

On October 24, 1963, Reliance and Beauchamp entered into a performance payment bond in favor of Georgetown. That bond provides, in relevant part, as follows:

KNOW ALL MEN BY THESE PRESENTS: That we Victor R. Beauchamp Associates * * * hereinafter called "Principal" and STANDARD ACCIDENT INSURANCE COMPANY, a Michigan Corporation, of Detroit Michigan, hereinafter called the "Surety", are held and firmly bound unto Georgetown University, Washington, D.C., hereinafter

porate action—the same purpose which this Court attaches to similar uses in the construction contract. *See* n.49 *supra.* The following is a reproduction of the signature page of the bond (*see* Part IV, *infra,* for discussion of the provisions of the bond):

IN WITNESS WHEREOF, this instrument is executed in six (6) counterparts, each one of which shall be deemed an original, this the 24th day of October, 1963

ATTEST:

/s/ Robert C. Blatzheim
(Principal) Secretary
(SEAL)

[Signature]
 Witness as to Principal

 (Address)

Victor R. Beauchamp Associates, Inc.
By: /s/ Edward M. Crough
 Edward M. Crough, President
 431 Cedar St., N. W., Washington 12, D. C.
 (Address)

ATTEST:

(Surety) Secretary
(SEAL)

[Signature]
 Witness as to Surety

 (Address)

STANDARD ACCIDENT INSURANCE COMPANY

By: /s/ Merrill K. Luhman
 Merrill K. Luhman, Attorney-in-Fact
 817-14th Street, N. W., Washington, D. C.
 (Address)

**52.** *See* Part III *supra.* The fact that any direct suit, under the construction contract, by Georgetown against Beauchamp is barred by limitations does not mean that Georgetown may not sue Reliance. *Cf. Regents of the University of California v. Hartford Accident and Indemnity Co.,* 21 Cal.3d 624, 147 Cal.Rptr. 486, 581 P.2d 197, 208 (Cal.1978), in which Justice Tobriner stated that "under the California law of suretyship the running of the statute of limitations on the principal obligation does not exonerate the surety [relieve the surety from all obligations]." In addition, *cf.* Restatement of Security § 125, which indicates that the surety may under certain circumstances be sued even when the principal may not.

called "Owner" in the penal sum of * * * ($2,019,619.00) * * * for the payment of which sum * * * we bind ourselves, our * * * successors, jointly and severally, firmly by these presents.

THE CONDITION OF THIS OBLIGATION is such that Whereas, the Principal entered into a certain contract with the Owner, dated the 24th day of October, 1963, a copy of which is hereto attached and made a part hereof for the construction of: Construction of Men's Residence Hall * * *

NOW, THEREFORE, if the Principal shall well, truly and faithfully perform its duties, all the undertakings, covenants, terms, conditions, and agreements of said contract during the original term thereof, and any extensions thereof which may be granted by the Owner, with or without notice to the Surety, and if he shall satisfy all claims and demands incurred under such contract, and shall fully indemnify and save harmless the Owner from all costs and damages which it may suffer by reason of failure to do so, and shall reimburse and repay the Owner all outlay and expense which the Owner may incur in making good any default, and shall promptly make payment to all persons, firms, subcontractors, and corporations furnishing materials for or performance of labor in the prosecution of the work provided for in such contract, and any authorized extension or modification thereof, including all amounts due for materials, lubricants, oil, gasoline, coal and coke, repairs on machinery, equipment and tools, consumed or used in connection with the construction of such work, and all insurance premiums on said work, and for all labor, performed in such work whether by subcontractor or otherwise, then this obligation shall be void; otherwise to remain in full force and effect.

PROVIDED, FURTHER, that the said Surety, for value received hereby stipulates and agrees that no change, extension of time, alteration or addition to the terms of the contract or to the work to be performed thereunder or the specifications accompanying the same shall in any wise affect its obligation on this bond, and it does hereby waive notice of any such change, extension of time, alteration or addition to the terms of the contract or to the work or to the specifications.

$$* \qquad * \qquad * \qquad * \qquad * \qquad *$$

In addition to the performance bond, Beauchamp and Standard (of which Reliance is the successor) entered into an Agreement of Indemnity. The parties seemingly agree that no copy of that Agreement of Indemnity is available at this date. The record in this case contains no basis at this time for concluding, in the context of the issues posed by Beauchamp's motion to dismiss Reliance's cross-claim, that that Agreement of Indemnity would vary to any significant extent from the provisions such an agreement might reasonably be expected to contain, or that that Agreement would contain provisions which would deviate significantly from conventional suretyship principles.[53] It is to be noted that the lost agreement was seemingly entitled "Agreement of Indemnity," implying by its title (which is all that is avail-

---

**53.** In that regard, it is to be noted that the contract between Georgetown and Beauchamp and the surety agreement both appear to be in rather standard form.

In A. Stearns, The Law of Suretyship § 11.36 at 510 (5th ed., Elder rev. 1951), the author points out that it is "usually the case [that] the express indemnity agreement is drawn by the surety." If that was the case herein, then it is likely that the indemnity agreement embodied conventional principles of suretyship law, including the protections which those principles give to sureties. Those principles will be discussed in greater detail *infra*.

Stearns indicates (§ 11.36 at 509; footnote omitted) that

[a]lthough the law will imply a promise of indemnity by the principal in the surety's favor, it has become more and more the practice, particularly by corporate compensated sureties, to exact express contracts of indemnity at the time the surety enters into his undertaking. These agreements may be termed contracts of conventional indemnity. In such a case, the promise implied by law will be merged in the express agreement and recovery will be limited to the terms of the latter.

able herein) certain aspects of its contents. However, all that is known about the relationship between Beauchamp and Standard is what may be gleaned from the performance bond and the fact that the surety/principal relationship existed (and still exists).

Beauchamp contends that Reliance, as Georgetown's surety, is the subrogee of Georgetown and that the fact that Georgetown may not sue Beauchamp directly under the construction contract bars any claim by Reliance, as subrogee of Georgetown, against Beauchamp. Reliance contends in response that the relationship between Reliance and Beauchamp is not a relationship pursuant to which Reliance's rights are subrogated to Georgetown's, but is rather a relationship pursuant to which Reliance is entitled to *indemnification* and/or *exoneration*[54] as against Beauchamp for any claims which Georgetown may successfully assert against Reliance.

While the performance bond explicitly incorporated the construction contract between Georgetown and Beauchamp, the bond itself constitutes a contract between Beauchamp and Reliance which established a certain legal relation between those parties. The wording of the performance bond, which refers throughout to Reliance as the surety and Beauchamp as the principal, and which does *not* refer to Georgetown except at one point[55], indicates that the relationship between Reliance and Beauchamp was the relationship of a surety

to a principal. Certain rights may be implied from the very existence of that relationship. In A. Stearns, The Law of Suretyship § 11.35 at 505 (5th ed., Elder rev. 1951) (hereinafter Stearns) it is stated that "[i]f the principal makes no express promise to indemnify the one who engages to answer for his debt or default, the law will imply a promise." The Restatement of Security § 104 comment f provides:

> The surety's right of reimbursement [*i. e.*, indemnity (*see* Special Note following the black letter law)] is equitable in origin. Where the surety has become such at the request or with the consent of the principal even without a specific agreement for reimbursement, the surety can obtain reimbursement on the theory of a contract between principal and surety implied from the circumstances. * * *

 If an obligee has no cause of action against the principal, then neither the surety nor the principal will be liable to the obligee. *See* Stearns § 11.41. Thus, in this case, if Georgetown had no cause of action for breach of the construction contract against Beauchamp, Reliance would not be liable on its performance bond, since the language of the bond itself indicates that the liability of Reliance on that bond depends upon whether Beauchamp adhered to the construction contract. Herein, Georgetown *does* have a cause of action in contract against Beauchamp for breach of the construction contract. While that cause

---

**54.** Exoneration as used herein is defined by the Restatement of Security as follows:

§ 112. EXONERATION.

Where the surety is under an obligation to the creditor [obligee] which has matured and which he has undertaken with the consent of the principal, and the surety, if he performed would be entitled to reimbursement from the principal, the surety has the right to exoneration.

*Comment:*

a. The principal owes the surety a duty to perform as soon as the performance is due. It is inequitable for the surety to be compelled to suffer the inconvenience and temporary loss which a payment by him will entail if the principal can satisfy the obligation. * * The right to such equitable relief is called the right of exoneration.

It is noted that the term "exonerate" is apparently used by Justice Tobriner in *Regents of the University of California v. Hartford Accident and Indemnity Co.*, 21 Cal.3d 624, 147 Cal.Rptr. 486, 581 P.2d 197 (1978), to mean complete relief from any obligation. The term "exoneration" is used in this opinion, unless specifically indicated to the contrary, as that term is defined in the Restatement—in other words, to refer to what might be called a right of indemnification in advance of the actual payment.

**55.** Georgetown is referred to simply as the party to which Standard and Beauchamp are bound. The reference makes it clear that Georgetown is the obligee. There is no other reference to Georgetown in the performance bond.

of action is barred by limitations, *see* Part III *supra*, the fact that it is so barred does not mean that that cause of action of Georgetown against Beauchamp does not exist: the right exists, but the remedy does not.[56] As discussed in Part I of this opinion, the limitations period has not run on the performance bond. Thus, Georgetown may sue Reliance on that bond.

A further question which is presented is whether Reliance may cross-claim against Beauchamp for indemnification and/or exoneration, despite the fact that the period of limitations has run on the contract claim as between Beauchamp and Georgetown. That question has two parts: first, whether Beauchamp has now or ever will have any obligation to indemnify and/or exonerate Reliance, and second, whether a cross-claim by Reliance against Beauchamp is appropriate.

As was noted above, Beauchamp contends that the running of the limitations period on the construction contract between itself and Georgetown means that Beauchamp has no remaining obligation to Reliance. That contention is incorrect: Reliance will be entitled to indemnification and/or exoneration from Beauchamp if Beauchamp in fact failed to perform the construction contract.

On the subject of indemnification, Stearns spoke as follows (at § 11.35 at 505–06; footnotes omitted):

> The third great equitable right of a surety is his right, on payment of the principal's debt, to be indemnified by the principal for the loss sustained by the surety in making payment of the debt. This right, sometimes also described as a right to reimbursement or exoneration, is universally recognized. The fact that the surety may have been compensated for undertaking his risk does not in any way affect his right to be indemnified by the principal.

> \* \* \* \* \* \*

> \* \* \* [A] payment by a surety or guarantor for the account of his principal is presumed to be at the request of the latter, which raises an implied promise of reimbursement, upon which an action at law will lie for money paid to the principal's use. \* \* \*

And, at § 11.41 at 522–23 (footnotes omitted; emphasis added), Stearns wrote:

> As a general rule, a principal owes no duty of indemnity in those cases where payment is made by his surety or guarantor upon claims for which the principal is not liable. If the principal has a defense which is not personal to him, which thus may be asserted by the surety, a failure by the surety to assert such a defense will make his payment voluntary and deprive him of the right to indemnity, provided he had knowledge of the defense. \* \* \*

> \* \* \* \* \* \*

> Where the defense is personal to the principal, such as a want of capacity to enter into the main contract, the surety will be bound even though the principal is not. In such event, the surety has no right of indemnity against the principal.

> Where the principal's defense is not available to the surety, for some reason other than the fact that the defense is personal to the principal, the surety may pay and enforce indemnity from the principal. *Where, for example, the running of the period of limitations has barred recovery from the principal, but not from the surety, the non-liability of the former*

---

**56.** In Part II *supra*, this Court discussed the nature of statutes of limitations, indicating that true statutes of limitations are procedural and not substantive. A true statute of limitations does not operate on the *right*, but rather simply operates on the *remedy*. Thus, Georgetown has a cause of action against Beauchamp on the construction contract between the two. The situation would be different if Georgetown had no cause of action against Beauchamp: if that were the situation herein, then Reliance could not be liable for Beauchamp's alleged failure to comply with the construction contract. Thus, this case is readily distinguishable from cases such as *Broder v. Hartford Accident & Indemnity Company*, 106 F.Supp. 343 (D.D.C.1952), in which there was no cause of action of the obligee against the principal. In the case at bar, the only reason why Georgetown cannot sue Beauchamp directly on the construction contract is that the limitations period has run. There is no substantive bar to such a suit.

*does not impair the surety's right of indemnity.* * * *

Beauchamp contends that no right of indemnity and/or exoneration exists herein because the rights of Reliance against Beauchamp are subrogated to the rights of Georgetown against Beauchamp and because Georgetown's rights directly against Beauchamp under the construction contract are barred by limitations. In *Regents of the University of California v. Hartford Accident and Indemnity Co.*, 21 Cal.3d 624, 147 Cal.Rptr. 486, 581 P.2d 197 (Cal.1978), a case somewhat similar on its facts to the case at bar, the surety had contended that it should be relieved of the obligations of the surety bond because the statute of limitations had run as between the principal and the obligee. Justice Tobriner rejected that contention, and stated (at 204–205, footnotes, except footnote 8, omitted) [57]:

> * * * [D]efendant's [surety's] only argument for a rule of exoneration [relieving the surety of its obligations on the bond altogether] is that a surety compelled to pay after the statute of limitations has run on the principal debt is denied its right to recover from the principal as the subrogee of the creditor's claim. The argument betrays a misunderstanding of California suretyship law. Under California decisions a surety who pays the principal debt extinguishes that obligation and thus cannot sue the debtor as subrogee of the original debt. [Citations omitted.] Subrogation in California suretyship law thus is not the surety's primary remedy for recourse against the principal; it [subrogation] refers instead to a variety of rights which the surety may assert against third parties, cosureties, and property, most of which are unaffected by the running of the statute of limitations on the principal debt. Thus * * * the surety's right of subrogation

[is] of relatively little importance to the surety * * *.

> The primary remedy that the surety can actually invoke against the principal is a suit based on the implied obligation of reimbursement. Because an action for reimbursement is a new cause of action, arising only when the surety pays the creditor, it is unaffected by the running of the period of limitation on the original debt.[8] Consequently, a rule of exonera-
>
> [8] [Citations omitted.] Language in three [California] Court of Appeal decisions [citations omitted] to the effect that a surety who pays after the statute has run on the principal debt has no recourse against the debtor rests on the premise that the surety's payment was "voluntary." At the time those decisions were filed, controlling California precedent held that a running of the period of limitation on the underlying debt exonerated the surety [relieved the surety of all obligations], so any subsequent payment by the surety would be voluntary in character. Since 1934, however, California decisions have declined to exonerate [relieve] the surety; thus under present law a surety could not be denied reimbursement on the ground that his payment [was] made after the period of limitations expired for the underlying debt.
>
> tion [relieving the surety of his obligations altogether] is not necessary to avoid impairment of the surety's right to reimbursement.

Thus, in *Regents* the Court stated that, even though the statute of limitations had run with regard to the contract between the obligee and the principal, the surety under California law would be entitled to reimbursement (indemnification) from the principal, irrespective of the fact that the obligee could not have collected against the principal. *See id.* 21 Cal.3d 624, 147 Cal. Rptr. 486, 581 P.2d at 212, where Justice Clark, dissenting, stated that that was "the majority holding." [58]

 Both Stearns and *Regents* indicate that the right of subrogation and the right of indemnity are two separate and

---

**57.** In *Regents*, the statute of limitations involved was a ten-year provision similar to D.C. Code § 12–310, discussed *supra* in part II of this opinion. However, unlike the result reached herein, the California Supreme Court decided that that ten-year provision was a "procedural statute of limitation," and not a substantive bar to suit. 21 Cal.3d 624, 147 Cal.Rptr. 486, 581 P.2d at 206–07. Thus, a

cause of action by the obligee as against the principal existed in the California case; the cause of action was, however, barred by a separate procedural statute of limitations.

**58.** The Court in *Regents* applied California suretyship law in reaching its result. However, the quotation from Stearns demonstrates that with respect to the particular issue of indemni-

distinct rights. The right of indemnity, which is implied from the fact of the surety/principal relationship, allows the surety to seek reimbursement from the principal for any payments made to the obligee where a cause of action exists as between the obligee and the principal, even when the statute of limitations would bar a direct claim by the obligee against the principal under the underlying contract. Thus, if Beauchamp breached its construction contract with Georgetown and Reliance is thus liable to Georgetown on the performance bond, Reliance may seek indemnity and/or exoneration against Beauchamp.

The fact that Reliance, if it is liable to Georgetown on the performance bond, may seek indemnification and/or exoneration does not answer the question of whether Reliance may cross-claim against Beauchamp in the case at bar prior to an adjudication that it is actually liable to Georgetown. Stearns speaks as follows (§ 11.36 at 509, 511; § 11.37 at 513–14; § 11.39 at 517; footnotes omitted):

> [N]o recovery can be had by the surety against the principal on the latter's indemnity agreement until the surety has actually suffered loss or damage under his suretyship agreement. * * *
>
> * * * * * *
>
> * * * [N]ormally the surety must first make payment of the principal's debt before he can call on the principal for indemnity * * *.
>
> * * * * * *
>
> An implied contract to indemnify one who pays the debt of another arises at the time the suretyship agreement is entered into * * *. The relation of debtor and creditor between the principal and the surety dates from the inception of the suretyship contract without regard to the time when the promisor pays * * *.

However, a cause of action against the principal does not arise until the promisor makes payment of the debt. * * *

> A cause of action for indemnity * * * cannot arise before the maturity of the debt. * * *
>
> It is usually held that the statute of limitations on an action by a surety for reimbursement from his principal commences to run at the time of the payment by the surety, not from the date of the maturity of the debt, on the ground that the cause of action is not on the debt itself but on the implied promise of reimbursement arising from the payment of the debt.
>
> * * * * * *
>
> Until the surety actually pays the principal's debt, in whole or part, he has no right to sue the principal for indemnity or reimbursement.[59]

The doctrine of equitable exoneration makes the burden on the surety lighter. Stearns speaks as follows (§ 11.38 at 515–16, footnotes omitted):

> A court of equity has jurisdiction to compel the principal to exonerate the surety or guarantor at the maturity of the debt. It is not necessary that the surety have paid, or have been called upon by the creditor to pay any part of the debt. Equity grants this right in order to avoid circuity of action and to prevent irreparable harm to the surety, since the principal is ultimately liable for the obligation.
>
> A surety cannot invoke this doctrine unless his liability is imminent and absolute. * * * Equity will go far to exonerate a solvent surety * * *.

Federal Civil Rule 13(g) provides:

A pleading may state as a cross-claim any claim by one party against a co-party

---

fication raised in *Regents*, California law seemingly follows standard suretyship principles. None of the parties to the case at bar contends that either Maryland or District of Columbia law—one of which is applicable herein—differs from standard suretyship principles, or that Maryland and District of Columbia law differ from each other with regard to the suretyship principles involved herein.

**59.** *Cf. Southern Maryland Oil Co. v. Texas Co.*, 203 F.Supp. 449, 452–53 (D.Md.1962) (Northrop, J.); *Northwest Airlines, Inc. v. Glenn L. Martin Co.*, 161 F.Supp. 452, 458 (D.Md.1958) (Watkins, J.).

arising out of the transaction or occurrence that is the subject matter either of the original action or of a counterclaim therein or relating to any property that is the subject matter of the original action. Such cross-claim may include a claim that the party against whom it is asserted is or may be liable to the cross-claimant for all or part of a claim asserted in the action against the cross-claimant.

Although Reliance has not yet been found liable to Georgetown, and thus no cause of action yet exists on the part of Reliance as against Beauchamp, the claim of Reliance against Beauchamp nonetheless fits within the language of Rule 13(g). In 3 Moore's Federal Practice ¶ 13.34[1] at 877–78, Professor Moore wrote:

> Subdivision (g) permits the assertion by way of cross-claim of "a claim that the party against whom it is asserted *is or may be* liable to the cross-claimant. . . ." (italics added [by Professor Moore]). * * * In certain situations this may have the effect of accelerating the accrual of a right.[11]
>
> [11] *United States Fidelity & Guaranty Co. v. Janich* (S.D.Cal.1943) 3 F.R.D. 16 * * * (Insurer brought an action for declaratory judgment against insured and claimant. *Held*, claimant may plead cross-claim against insurer and insured in spite of provision of policy that no action should lie against insurer unless judgment had been entered against insured.); *Bohn v. American Export Lines, Inc.* (S.D.N.Y.1941) 42 F.Supp. 228 * * * (in action for personal injuries against employer and a third party, the employer may cross-claim against the third party for any amounts for which the employer might be held liable to plaintiff, even though at common law the third party would not have been liable until the employer's liability had been fixed by judgment).

Emphases in original; footnotes 9 and 10 omitted.

The phrase "is or may be liable" appears in Rule 13(g) and also in Rule 14(a) relating to third-party claims. The scope and meaning of that phrase is discussed by Professor Moore as part of his discussion of Rule 14(a); however, the language has the same meaning in both Rules. *See* 3 Moore's Federal Practice ¶ 13.34 at 877–78 & n.10 (cross-reference to discussion of phrase "is or may be liable" in section on Rule 14(a)). Profes-

sor Moore explains the meaning of the phrase as follows (¶ 14.08 at 243–44, 246, footnotes omitted, except n.10):

> As in all third-party practices, the accrual of a right is sometimes accelerated under Rule 14. Rule 14(a) authorizes impleader of a party "who is *or may be* liable." The italicized words or their equivalent are necessary. For example, there are two kinds of indemnity: indemnity against liability and indemnity against loss. First assume that *E.F.* has agreed to indemnify *C.D.* against certain liability and that subsequently *A.B.* sues *C.D.* and the liability asserted against *C.D.* is within the indemnity agreement. *C.D.* can implead *E.F.* because under their agreement *E.F.* is immediately liable. Now assume that *E.F.* has agreed to indemnify *C.D.* against loss. Clearly *E.F.* is not liable in an independent action on his indemnity agreement until *C.D.* has suffered loss, and *C.D.* has suffered no loss merely because of the commencement of the action by *A.B.* Were it not for the italicized words, *supra, C.D.* could not implead *E.F.* By virtue of them *C.D.* is enabled to implead *E.F.*, but the substantive status of *E.F.* will not be affected. The time when *C.D.*'s claim is presented against him has been accelerated. But although a judgment may be obtained on the third-party claim, *C.D.* could not execute thereon until he had discharged *A.B.*'s judgment against him * * * so that he brings himself within his indemnity-against-loss agreement with *E.F.*
>
> \* \* \* \* \* \*
>
> In * * * the foregoing instances, the impleaded third party's substantive rights are unaffected since the defendant cannot normally enforce his judgment against the third party until the judgment in the original proceeding has been paid or satisfied.[10]
>
> [10] In an appropriate situation, the defendant could require the third-party defendant to satisfy the defendant's obligation to the plaintiff directly under the principle of exoneration.

The applicability of the above-quoted language to the within case is apparent. Beauchamp may become liable to Reliance,

because under the indemnity relationship between the two parties Beauchamp must indemnify Reliance against loss. Moreover, in this case, in which the doctrine of equitable exoneration may be applicable, Beauchamp may be required upon application to the Court by Reliance to make direct payment to Georgetown once the obligation of Reliance to Georgetown (Part I) has been ascertained by adjudication.[60]

60. This opinion operates to dismiss Beauchamp from any direct suit by Georgetown on the construction contract. However, for the reasons set forth in Part V infra, Georgetown is permitted to proceed against Beauchamp under the bond. Were it not for Georgetown's said right so to proceed under the bond, it would be necessary for this Court to answer the question of whether a cross-claim by one defendant against another defendant automatically becomes a third-party complaint when the plaintiff's claim against that second defendant is dismissed. That issue, however, need not be determined herein because of the conclusion reached in Part V hereof, and also because of Federal Civil Rule 14(a) which provides, in pertinent part:

At any time after commencement of the action a defending party, as a third-party plaintiff, may cause a summons and complaint to be served upon a person not a party to the action who is or may be liable to him for all or part of the plaintiff's claim against him.

As the language of the Rule and Professor Moore's analysis of the phrase "is or may be liable" both indicate, Beauchamp may be joined at this time as a third-party defendant in this suit by Reliance, even if Reliance cannot maintain a cross-claim against Beauchamp. Whether Beauchamp remains in this suit as a party against which a cross-claim is asserted, or as a party against which a third-party claim is asserted, or in both of those positions, seemingly makes little or no difference to the rights dealt with in this opinion or to the respective positions and possible liabilities of the parties. Accordingly, Reliance's claim against Beauchamp will be treated as both a crossclaim and a third-party claim.

In any event, on a purely pragmatic basis it makes sense to keep Beauchamp in as a party to this suit. If Reliance is liable to Georgetown, then Beauchamp will be liable to Reliance. Thus, Beauchamp has a strong interest in the result of this action. See Federal Civil Rule 19(a). In addition, as Reliance has pointed out, trial in this case will involve and turn upon the question of whether Beauchamp breached its construction contract with Georgetown. Beauchamp, as the construction firm actually involved in the events at issue, is seemingly well qualified to defend against Georgetown's allegations of breach of contract. In that regard, it is to be noted:

If the surety is sued with the principal, or is sued alone with notice to the principal, and a judgment is recovered which is paid by the surety, such judgment is conclusive against the principal as a basis of recovery in an action for indemnity * * *.

Stearns § 11.43 at 525.

Thus, if Beauchamp does not participate in this suit, it runs the risk of liability to Reliance on any judgment against Reliance without having the opportunity to defend itself. Moreover, whether Beauchamp is in or out of the suit, if it is ultimately decided that Beauchamp did in fact breach its construction contract with Georgetown, Beauchamp may be liable to Georgetown under the doctrine of equitable exoneration before Reliance has to pay Georgetown anything. Stearns § 11.38 at 515 states that "[e]quity grants [the right of equitable exoneration] in order to avoid circuity of action and to prevent irreparable harm to the surety, since the principal is ultimately liable for the obligation." Keeping Beauchamp a party to this action avoids potential irreparable harm to Reliance, which otherwise would be the sole party defending herein, and also avoids the necessity for Reliance to institute another suit if Reliance is liable to Georgetown and must bring a separate suit against Beauchamp as a result of that liability.

It is also to be noted that—

A promisor in suretyship is entitled to full indemnity from the principal for all loss occasioned by the default of the latter and may call upon him for reimbursement, not only for what he is required to pay in satisfaction of the debt, but also for all reasonable expenses incurred in the matter of the adjustment of his liability. * * *

Where the surety is sued alone, he may recover the costs of litigation from the principal, unless the defense is successful, in which event no recovery in indemnity should be allowed since the surety has sustained no damage because of the principal's act, neglect or default. * * *

Normally, attorney fees incurred by the surety in defending litigation brought against him by the creditor are included in the costs for which the principal must indemnify the surety, unless the defense is successful. The right of indemnity extends to attorney fees incurred prior to suit in investigating the claim, or negotiating a settlement of the claim.

The statute of limitations in Maryland, the forum state, is three years for contracts and twelve years for bonds such as the performance bond herein. If a principal were freed of its obligation to indemnify the surety by the mere fact that the statute of limitations had run as between the principal and the obligee, it could often happen that a surety would be held liable while the principal—upon whose fault the liability would rest—would be free of any possibility of liability. In other words, under the applicable limitations statutes (and in the absence of provisions in the contracts themselves to the contrary) a surety would have nine years more of potential liability than the principal it has insured. Such a construction—which is the conclusion to which Beauchamp's arguments lead—makes little sense. Moreover, the conclusion that the statutes of limitations act so as to give a surety nine more years of liability than its principal would also mean that the statutes of limitations act to eliminate the operation of equitable principles of suretyship law when the statute of limitations has run as to the claim of the obligee against the principal but not as to the claim of the obligee against the surety. The applicable statutes of limitations certainly do not explicitly provide for any such restriction upon the operation of certain principles of suretyship law. This Court is unwilling to infer that those statutes, *sub silentio*, so provide.

If the limitations statutes are restricted to their sphere as procedural provisions and are not construed so as to prevent the operation of conventional suretyship principles, the result in this case makes good sense. The question of whether Beauchamp breached its obligations under the construction contract with Georgetown must be tried in any event. One of the purposes of statutes of limitations—to prevent the trial of stale claims—will not be violated if this Court holds that Reliance may cross-claim against or implead Beauchamp: the claims of Georgetown against Beauchamp will be equally stale (or fresh), whether or not Beauchamp remains a party to this suit. In this situation, to allow Reliance to cross-claim against or implead Beauchamp for indemnification in the event Reliance is found liable to Georgetown comports with the provisions of suretyship law and does no violence either to the principles behind limitations laws, to the language of the applicable limitations laws, or to the federal rules of civil procedure.

## V. *Beauchamp's Motion for Summary Judgment as to the Performance Bond*

In Part III, Georgetown's claim against Beauchamp under the construction contract is held barred by limitations. In Part I, Reliance's limitations defense against Georgetown's claim against Reliance under the bond is held lacking in merit. For the same reasons set forth in Part I, Beauchamp cannot successfully assert the bar of limitations in the face of Georgetown's claim against Beauchamp under the bond. The question, however, arises as to whether Beauchamp is liable under the bond independently of Beauchamp's liability under the construction contract. The answer to that question depends upon the meaning of the language of the bond [61] and the intent of the parties, i. e., Georgetown, the obligee, and Reliance and Beauchamp. [62] That intent, in this instance, is clearly revealed by the provisions of the bond, the first paragraph of which specifically provides that

Stearns § 11.40 at 518–20 (footnotes omitted). *See* Restatement of Restitution § 80 comment b.

**61.** Set forth *supra* at p. 58.

**62.** *See, e. g., State Hwy. Admin. v. Transamerica Ins. Co.,* 278 Md. 690, 699, 367 A.2d 509 (1976) (*quoting Walsh v. Jefferson Association,* 216 Md. 131, 137, 139 A.2d 847, 850 (1958)) ("The cardinal rule in the interpretation of bonds, as in the interpretation of all written contracts, is to ascertain the intention of the parties and to give effect to that intention if it can be done consistently with legal principles."); *Fidelity & Deposit Co. v. Mattingly Lumber Co.,* 176 Md. 217, 222, 4 A.2d 447 (1939) ("Generally speaking, the construction of a bond is, like other contracts, governed by the intention of the parties at the time of its execution, and the intention is to be ascertained from a consideration of the bond provisions.").

"we [*i.e.*, Standard (Reliance) and Beauchamp] bind ourselves * * * jointly and severally * * *." Thus, the bond specifically, by its own terms, imposes liability upon Beauchamp.

It is true that in the bond Beauchamp is designated as the principal and Standard (Reliance) is designated as the surety. 21 M.L.E. "Sureties" § 21 at 10 does state that "[a] party cannot be bound as principal and surety in the same instrument," citing to and relying upon *Wanamaker v. Bowes*, 36 Md. 42 (1872). In that case, Wm. H. Wanamaker, purporting to be the agent of John Wanamaker, signed a bond on behalf of John Wanamaker as principal, and in his own behalf as surety. The bond also referred to "the above bounden W. H. Wanamaker." The Court, after first stating that John Wanamaker was not the principal because W. H. Wanamaker lacked authority to bind John, *id.* at 56, concluded that W. H. Wanamaker could not be "bound as principal, for it is expressly stated that he and Robert Cathcart bind themselves as *sureties*, and a party cannot be both principal and surety in the same obligation." *Id.* (Emphasis in original). Accordingly, the bond in *Wanamaker* was deemed void.

But *Wanamaker* does not stand for the proposition that a principal is not liable on a surety bond as a *principal*. Indeed, that case did not deal with that issue. Rather, at most, *Wanamaker* held that, in meeting the formal requirements for making a bond, the same person cannot be both principal and surety.

There seemingly is no reason why the parties to a surety bond cannot, if they so desire, provide in the bond for the principal to be liable under the bond irrespective of the underlying contract. Thus, Stearns, *Law of Suretyship* § 8.26 at 294 (Elder's Rev. 5th ed. 1951) (footnotes omitted; emphasis added), wrote:

> Where the surety's bond binds him *jointly and severally* for the faithful performance of the obligation of the principal, the obligee may sue the surety separately without joining the principal as a party defendant, or he may proceed

against one or more of several sureties, or he may sue the principal without joining any or all of the sureties. On the other hand, the obligee may, if he wishes, sue the principal and the sureties in the same action and recover a judgment against all of them.

12 Am.Jur.2d *Bonds* § 29 at 497 (footnotes omitted) states:

> Whether the obligations undertaken in a bond are joint or several depends in general upon the terms of the contract, if express, and where not express, upon the intention of the parties as gathered from all the circumstances of the case. * * * All the obligors may be sued upon a joint bond, but on a joint and several bond a creditor may sue all jointly or separately for the whole amount. Although, as between the obligors and obligees, all the obligors are principals, as between each other they may have the rights and remedies resulting from the relation of principal and surety. In a joint obligation, as well as in a joint and several obligation, each obligor who is bound at all is legally liable for the whole undertaking, and where a creditor releases one of several joint debtors, or joint and several debtors, such release to one operates as a release to all. * * *

72 C.J.S. *Principal and Surety* § 89 at 568 (footnotes omitted; emphases added) states:

> The principal and sureties may be *bound* jointly or jointly and severally. * * Each *signer* is liable for the entire indebtedness where the liability is joint and several, and an agreement by the creditor not to exact more than a proportionate share from each is not binding.

Section 245 of that compilation, at 699, adds: "The right of the creditor to maintain an action against the principal exists independently of his rights as against the surety * * *."

Numerous cases cited by Am.Jur. and C.J.S. contain explicit statements that principals are liable on surety bonds. However, it must be noted that most of those cases involved actions against sureties, rather

than principals.[63] Indeed, it is probably fair to state that there are no express holdings in the case law either supporting or barring Georgetown's right to proceed under the bond against Beauchamp as a principal.

Beauchamp argues that the purpose of the parties in using the words "joint and several" in the bond was not to provide therein for the principal's liability, but rather to preserve the surety's rights against the principal in the event of Beauchamp's default. However, those words are seemingly not needed to accomplish that latter purpose, since even without them those rights of the surety apparently exist. *See, e. g., Mallis v. Faraclas,* 235 Md. 109, 114, 200 A.2d 676 (1963).

The words "joint and several" are oft used and seemingly well understood. Thus, Bouvier's Law Dictionary 1703 (1914) states: "A liability is said to be joint and several when the creditor may sue one or more of the parties to such liability separately, or all of them together." Beauchamp has not cited, nor has this Court found, any authority which indicates that the words "jointly and severally" have ever been interpreted so as to bar the liability of either obligor.

██ This is not a case in which an obligee who is prevented by limitations from proceding against the principal under the underlying contract is seeking to proceed against that principal under a surety bond which does not explicitly bind both the principal and the surety jointly and severally. Rather, this is a case in which the bond explicitly does so bind each and both of the principal and the surety and in which there is nothing stated or implied in either the underlying construction contract or in the bond to the effect that the principal's liability under the bond cannot be asserted when the principal's obligations under the contract cannot be enforced because of limitations.[63A] Accordingly, this Court concludes that Georgetown may proceed under the bond against Beauchamp as well as Reliance in accordance with the language of the bond itself.

## VI. The Cross-Claim of Reliance against Anchor

██ Reliance, in addition to cross-claiming against Beauchamp, has also cross-claimed against Anchor. Anchor was not a party to the performance-payment bond. Thus, Reliance has no claim against Anchor under that bond. But Reliance seeks as the subrogee of Beauchamp, against which Reliance has cross-claimed, *see* Part IV, to claim in Beauchamp's shoes against Anchor.

Anchor was contractually obligated to Beauchamp. However, as all of the parties in this case agree, the Anchor-Beauchamp contract was not under seal. Since the

---

**63.** *See, e. g., Pavlantos v. Garoufalis,* 89 F.2d 203, 205–06 (10th Cir. 1937) (emphases added) ("A contract of *surety* is the joint and several obligation of the principal and surety. A contract of *guaranty* is a promise to pay or an assumption of performance of some duty upon failure of another who is primarily obligated in the first instance. It usually is a separate undertaking in which the person primarily liable does not join."); *Cohen v. Maryland Cas. Co.,* 4 F.2d 564, 565–66 (E.D.S.C.1925) (in which the bond provided, *inter alia*: " * * * we bind ourselves, and each and every of us." (emphasis omitted), and in which the Court wrote that "[a]n action may be maintained against the sureties, or one or more of them without, [sic] joining the principal, or against the principal alone, as well as against the principal in conjunction with any of the sureties, at arbitrary selection."); *Zachry v. City Council of Augusta,* 52 S.E.2d 339, 341 (Ga.Ct.App.1949); *Adams v. McNutt,* 83 Ind.App. 694, 149 N.E. 735,

736 (Ind.Ct.App.1925); *cf. Luckenbach v. Pedrick,* 116 F.Supp. 268, 273 (S.D.N.Y.1953), *aff'd,* 214 F.2d 914 (2d Cir. 1954); *J. R. Watkins Co. v. Love,* 383 S.W.2d 149, 153 (Kansas City Ct.App.1964); *Rochester Sav. Bank v. Stoeltzen & Tapper,* 26 N.Y.S.2d 718, 720–21 (Sup.Ct. Monroe Co. 1941); *Van Alstyne v. Van Slyck,* 10 Barb. 383, 387 (N.Y.Sup.Ct.1851); *Pickett v. Rigsbee,* 113 S.E.2d 323, 327 (N.C.1960). Several other cases also state in dicta that a principal is liable on a surety bond. *See, e. g., Alabama Bank & Trust Co. v. Garner,* 142 So. 568, 570 (Ala.1932); *Municipal Court v. Whaley,* 25 R.I. 289, 55 A. 750, 750 (1903).

**63A.** Again, it is to be noted, as stated *supra* at p. 62, that Georgetown *does* have a cause of action under the construction contract against Beauchamp even though that cause of action cannot be effectively asserted because of limitations.

discovery rule is not applicable in a suit stated in contract, see Part II supra, the applicable three-year limitations statute expired long before this case was instituted by Georgetown. Accordingly, any contract claim assertable by Beauchamp against Anchor is barred.

Any possible tort claim Beauchamp may have against Anchor is non-existent under section 12–310. See Part II supra. Thus, as subrogee of Beauchamp, Reliance possesses no tort claim against Anchor.

Accordingly, Reliance's cross-claim against Anchor will be dismissed.[64]

### VII. Summary of Conclusions

For the above-set-forth reasons, this Court concludes:

1. Georgetown's contract claim against Reliance has been timely filed;

2. The tort claims asserted by Georgetown against defendants Madden, Walton, Auerbach, Scullen and Marchigiani, Beauchamp and Anchor are untimely;

3. Georgetown's contract claim against Beauchamp on the construction contract is untimely;

4. Reliance's cross-claim (third-party claim) against Beauchamp for indemnity and/or exoneration has been timely filed; and

5. Georgetown's claim against Beauchamp on the performance bond has been timely filed.

6. Reliance's cross-claim against Anchor cannot be maintained.

### VIII. Liability of Crough

■ If Reliance is held liable to Georgetown, and if Beauchamp is in turn held liable to Reliance, Crough, as director-trustee, will be liable to Reliance for such liability of Beauchamp, to the extent set forth by Judge Young in his Memorandum and Order dated January 27, 1978. While additional documents have been filed in this case since Judge Young decided those issues in the context of the record then before him, those additional documents do not alter the factual basis for Judge Young's said determinations. Limitations provide no greater defense to Crough as director-trustee than to the Beauchamp corporation. Since that defense does not entitle Beauchamp to dismissal of Reliance's claim, it does not protect Crough in the face of a claim by Reliance.[65]

### IX. Application of Federal Civil Rule 54(b) and 28 U.S.C. § 1292(b)

The judgments entered in favor of defendants Madden, Walton, Auerbach and Scullen and Marchigiani (Part II) and in favor of Anchor (Parts II and VI) are hereby constituted as "final judgments" under Federal Civil Rule 54(b). There is no just cause to delay entry of such final judgments as to those parties.

The judgments entered in Beauchamp's favor as against Georgetown on the tort claims (Part II) and in the suit on the construction contract (Part III) are hereby constituted final judgments, since no just cause exists for delaying entry of such final judgments. Although Beauchamp may ultimately be liable to Reliance and to Georgetown on the performance bond (Parts IV and V), it will not be liable to Georgetown on the construction contract itself.

If Georgetown appeals from the above-mentioned final judgments within the applicable time limits, this Court will certify the issues decided in Parts I and V of this opinion, pursuant to 28 U.S.C. § 1292(b). While this Court would not normally certify either of those issues for appeal, it would make sense, if the final judgments are ap-

---

64. While Anchor has not affirmatively sought dismissal, this case will be treated as if it had so done, with the agreement of all counsel. See n.17 supra.

65. Mr. and/or Mrs. Beauchamp were the sole stockholders of the Beauchamp corporation at the time of its liquidation and seemingly received all of the assets thereof. Neither Mr. nor Mrs. Beauchamp is presently a party to this case. The question of whether either or both of them has any liability in connection with this case is not presently before this Court.

pealed by Georgetown, to have the questions of whether or not Reliance and/or Beauchamp may be liable on the bond decided on appeal as well. The questions decided in Parts I and V, taken together, constitute controlling questions of law: if the rest of the questions resolved in this opinion are correctly decided, and if the results reached in Parts I and V are incorrect, then this case will be over. Thus, an appeal in connection with Parts I and V at this time has the potential for materially advancing the ultimate resolution of this case. Finally, the answers to the questions resolved in Parts I and V are not entirely obvious. In sum: (1) if this Court has not correctly decided the issues posed in Parts I and V, but has correctly determined the other issues considered in this opinion, the issues decided in Parts I and V will be controlling questions of law; (2) there is a sufficiently substantial ground for difference of opinion as to the questions decided in each and both of Parts I and V to satisfy the standards of 28 U.S.C. § 1292(b); and (3) an immediate appeal from the Order may materially advance the ultimate determination of the litigation, particularly if Georgetown appeals from the final Rule 54(b) judgments being today entered by this Court.

Additionally, if Georgetown appeals from those Rule 54(b) judgments, this Court will also certify the issue decided by Judge Young in his Memorandum and Order dated January 27, 1978, denying the Motion to Quash Service of Process on defendant Crough. *See* Part VII *supra.* If the determinations of this Court in that regard are not correct, then Crough will seemingly be out of the case. Also, as to those issues, there is a sufficiently substantial ground for difference of opinion with regard thereto to satisfy the standards of 28 U.S.C. § 1292(b). Further, an immediate appeal as to those issues may materially advance the ultimate determination of the litigation, particularly if Georgetown appeals from the final Rule 54(b) judgments being today entered by this Court. That is so because

while the Reliance cross-claim against Beauchamp is not barred by limitations, *see* Part IV *supra,* if Crough is dismissed as a third-party defendant, the factual issues requiring resolution which are discussed in Judge Young's said January 27, 1978 Memorandum and Order will not remain for trial. Further, if Crough is dismissed as a third-party defendant and the Beauchamp corporation is an empty shell, a judgment against it may not be of any practical value to Reliance unless it leads to a successful assertion by Reliance, directly or indirectly, of liability against Mr. and/or Mrs. Beauchamp.[66]

If no appeal is filed by Georgetown in connection with the final judgments entered herein, this Court will then immediately schedule the final discovery, pre-trial and trial phases of this case.

## ORDER

For the reasons set forth in an opinion filed earlier today, it is hereby ORDERED:

(1) The action by Georgetown against Reliance on the performance bond was timely filed. Accordingly, the motion of Reliance for summary judgment is hereby DENIED.

(2) Georgetown has no cause of action in tort against any of the defendants herein. Accordingly, summary judgment is hereby GRANTED, with regard to the tort claims asserted by Georgetown, in favor of defendants Madden, Walton, Auerbach, Scullen and Marchigiani, and Beauchamp, and also Anchor.

(3) The action by Georgetown against Beauchamp, based on the construction contract, was not timely filed. Accordingly, the motion of Beauchamp for summary judgment, with regard to the construction contract, is hereby GRANTED. *But see* paragraph (5) *infra.*

(4) The cross-claim by Reliance against Beauchamp may be stated by Reliance. Accordingly, Beauchamp's motion to dismiss that claim is hereby DENIED.

---

**66.** *See* n.65 *supra.*

(5) The action by Georgetown against Beauchamp, based on the performance bond, was timely filed. Accordingly, the motion of Beauchamp for summary judgment with regard to the bond, is hereby DENIED.

(6) Reliance's cross-claim against Anchor cannot be maintained. Accordingly, that cross-claim is hereby DISMISSED.

(7) The Clerk is directed to enter final judgments pursuant to Federal Civil Rule 54(b) in favor of Madden, Walton, Auerbach, and Scullen and Marchigiani with regard to the tort claims.

(8) The Clerk is directed to enter final judgment pursuant to Federal Civil Rule 54(b) in favor of Anchor, with regard to the tort claims and also with regard to the cross-claim brought by Reliance against Anchor.

(9) The Clerk is directed pursuant to Federal Civil Rule 54(b) to enter final judgment in favor of Beauchamp on the tort claims brought against Beauchamp by Georgetown, and on the contract claim brought against Beauchamp by Georgetown.

(10) If Georgetown appeals to the United States Court of Appeals for the Fourth Circuit from the final Rule 54(b) judgments set forth *supra*, this Court will promptly thereafter certify certain issues to that appellate Court pursuant to 28 U.S.C. § 1292(b) in accordance with the opinion filed earlier today in this case.

### APPENDIX

THE PRESIDENT AND DIRECTORS
OF GEORGETOWN COLLEGE \* CIVIL NO.
 v. \* Y–77–1438

DENNIS W. MADDEN, et al \*

### MEMORANDUM AND ORDER

JOSEPH H. YOUNG, District Judge.

Plaintiff has sued various defendants in connnection with the alleged defective construction of Harbin Hall, a mens' dormitory. Defendant Victor R. Beauchamp Associates, Inc. (hereinafter Beauchamp), the general contractor, is sued for negligence and breach of contract. Beauchamp is no longer in existence. Incorporated in Maryland, its charter was forfeited for nonpayment of taxes in April, 1973, and has not been revived.

By order of this Court, service of process on David Betts, the former resident agent, was quashed. Service was then made upon Edward M. Crough, Executive Vice-President and a Director at the time of forfeiture, and Martha Turner, Secretary. Both have moved to quash service of process, or in the alternative, for declaratory judgment, declaring rights, duties and legal relations in this case. Plaintiff has opposed only Crough's motion to quash.

■ Martha Turner's motion to quash service will be granted since she was not a Director when forfeiture of the charter occurred. Edward Crough's motion to quash service will be denied, since he was a Director.

■ As a Director, he became a trustee of Beauchamp's assets upon forfeiture. As trustee, he is obligated to satisfy claims which plaintiff can prove were existing debts of the Corporation upon forfeiture out of remaining corporate assets.

■ At common law, a dissolved corporation has no existence for any purpose. If corporate life is to continue for purposes of litigation, statutory authority is necessary. *Oklahoma Natural Gas Co. v. Oklahoma*, 273 U.S. 257, 259, 47 S.Ct. 391, 392, 71 L.Ed. 634 (1927). Since Beauchamp was incorporated in Maryland, Maryland law determines whether it can be sued after forfeiture of its charter. Rule 17(b) F.R.Civ.P.; *Johnson v. RAC Corporation*, 491 F.2d 510 (4th Cir. 1974); *Johnson v. Helicopter & Airplane Services Corp.*, 404 F.Supp. 726, 729 (D.Md.1975).

Under Md.Code Ann., Corporations and Associations Article, § 3–503(c), the forfeiture of a charter for nonpayment of taxes renders all corporate powers "inoperative, null and void." Maryland law provides for

revival of forfeited charters, which validates acts done in the corporate name while the charter was void. Corporations and Associations Article §§ 3–508, 3–513.

In some jurisdictions, the fact that state law gives a right of revival has been a factor in determining that forfeited corporations may still be treated as corporations for some purposes. The corporations are seen as being in a state of suspension, but not dead. *E. g., United States v. Indian Hill Farm*, 255 F.2d 282, 284 (2nd Cir. 1958); *Watts v. Liberty Royalties Corporation*, 106 F.2d 941, 944 (10th Cir. 1939).

■ Maryland law, however, is otherwise. Despite the possibility of revival, the forfeited corporation is considered totally non-existent. *In re Hare*, 205 F.Supp. 881, 884 (D.Md.1962); *Atlantic Mill & Lumber Realty Co. v. Keefer*, 179 Md. 496, 499–500, 20 A.2d 178 (1941); *Cloverfields Improvement Association, Inc. v. Seabreeze Properties, Inc.*, 280 Md. 382, 373 A.2d 935 (1977). In *Atlantic Mill*, involving forfeiture for nonpayment of taxes, the Court, quoting from Corpus Juris Secundum, stated:

> After a corporation has become effectually dissolved in any mode known to the law, its power to sue or be sued, either in actions *in personam* or *in rem*, in its corporate name, is extinguished; nor can it thereafter be brought in and joined as a party plaintiff or defendant in an action brought by or against another.

179 Md. at 500, 20 A.2d 178. Accordingly, in Maryland no suit can be brought against a forfeited corporation, except to the extent and under circumstances specifically authorized by statute.

Under Corporations and Associations Article § 3–516, upon forfeiture the directors become trustees of the assets for purposes of liquidation.*

### § 3–516 POWERS OF DIRECTORS ON FORFEITURE

(a) *Directors become trustees.*—When the charter of a Maryland corporation has been forfeited, until a court appoints a receiver, the directors of the corporation become the trustees of its assets for purposes of liquidation.

(b) *General powers.*—The director-trustees are vested in their capacity as trustees with full title to all the assets of the corporation. They shall:

(1) Collect and distribute the assets, applying them to the payment, satisfaction, and discharge of existing debts and obligations of the corporation, including necessary expenses of liquidation; and

(2) Distribute the remaining assets among the stockholders.

(c) *Specific powers.*—The director-trustees may:

(1) Carry out the contracts of the corporation;

(2) Sell all or any part of the assets of the corporation at public or private sale;

(3) Sue or be sued in their own names as trustees or in the name of the corporation; and

(4) Do all other acts consistent with law and the charter of the corporation necessary or proper to liquidate the corporation and wind up its affairs.

(d) *Majority governs.*—The director-trustees govern by majority vote. (1975, ch. 506).

Under the 1975 recodification of the statute, directors of voluntarily dissolved corporations have identical responsibilities and powers, pursuant to § 3–410. Article 23 § 78, the precursor of § 3–410, was substantively the same, but did not contain the limiting word "voluntary." There was no section specifically dealing with forfeitures. The case law applied Article 23 § 78 to both forfeitures and voluntary dissolutions. *Callahan v. Clemens*, 184 Md. 521, 41 A.2d 473 (1945); *Atlantic Mills & Lumber Co. v.*

---

* They continue as trustees until a receiver is appointed. Neither side indicates that a receiver was ever appointed in the instant case.

*Keefer, supra; American-Stewart Distillery, Inc. v. Stewart Distilling Co.,* 168 Md. 212, 177 A. 473 (1935). In short, at all times relevant to this action, the directors, as trustees upon forfeiture, would have had substantially the same duties and powers now set forth in § 3–516. These include the power to "sue or be sued in their own names as trustees or in the name of the corporation." Therefore, Edward Crough, a director at the time of forfeiture, is a proper person upon whom to serve process. His motion to quash service must be denied. Since Martha Turner was not a director, her motion to quash service must be granted.

The essential purpose of § 3–516 is to provide for liquidation. The trustees are to apply the assets "to the payment, satisfaction, and discharge of <u>existing</u> debts and obligations of the corporation". (Underlining added.)

▆▆▆ Crough, as director-trustee, has an obligation to plaintiff only if the claims can be considered an existing debt or obligation of the corporation at the time of forfeiture. In *Callahan v. Clemens, supra,* the Maryland Court of Appeals assumed, without deciding, that recovery could be had on a tort claim, brought subsequent to dissolution, although it found that limitations barred suit. The Court stated:

> Dissolution occurred on February 23, 1939, and the rights of creditors became fixed at that time; the forfeiture put an end to the corporate existence. (Citations omitted.) Even if we assume, without deciding, that the complainant, on the basis of a tort claim, was a creditor of the corporation within the meaning of the statute at the time of dissolution, and that there are assets in the hands of the directors (although this is not alleged), limitations as to such a claim would seem to be a good defense, for the reasons indicated above.

184 Md. at 528, 41 A.2d 473.

The above language also indicates that Crough would only be liable to the extent that assets still remain. In his affidavit, he indicates that he did not receive assets as part of liquidation and that he has not held or controlled such assets since 1970. However, even if he had no personal control, by law he is a trustee of any assets which remain.

In summary, Edward Crough, a director, can be sued in the corporate name, and can be called upon to satisfy corporate debts to the extent of the corporate assets. Tort and contract claims may be existing debts. This is the nature and extent of his obligation in this lawsuit. Whether plaintiff's claims meet these criteria is a matter for proof.

Accordingly, it is this 27th day of January, 1978, by the United States District Court for the District of Maryland, ORDERED:

1. That Martha Turner's motion to quash service of process be, and the same is, hereby GRANTED;

2. That Edward Crough's motion to quash service of process be, and the same is, hereby DENIED;

3. That the motions for a hearing on the rights and obligations of Edward Crough and Martha Turner be, and the same is, hereby DENIED; and

4. That Edward Crough, as a director at forfeiture, can be sued in the corporate name and is obligated to satisfy claims which plaintiff proves existed at the time of forfeiture, out of corporate assets which remain.